# EXHIBIT 15



P.O. Box 480
Belton, TX 76513

(254) 933-5160
Fax (254) 933-5176

email: shelley.coston@co.bell.tx.us

**Shelley Coston**
Bell County Clerk

## MISDEMEANOR RECORD SEARCH

NAME: RETZLAFF, THOMAS CHRISTOPHER

DOB: ███████

A personal review of the records of the above named individual disclosed the following information with respect to the individual's Misdemeanor Criminal History Record.

| | |
|---|---|
| Cause Number: | MR2C971672 |
| Original Offense: | M A SELL DISTB DISPLAY HARMFUL MATERIAL/MINOR, |
| Final Offense: | M A SELL DISTB DISPLAY HARMFUL MATERIAL/MINOR |
| Date of Offense: | 1/31/1997 |
| Arresting Agency: | TPD |
| Disposition Date: | 9/02/1997 |
| Status: | PG |
| Description: | FINE AND COSTS SERVED IN JAIL |
| Time Assessed: | 325 |
| Fines: | $100.00 |
| Court Costs: | $157.00 |
| Balance: | $0.00 |

It is expressly understood that there is no guarantee of correctness; that the county clerk nor deputy providing this information shall not be held liable for records listed or omitted in error.

Given under my hand and seal of office, this 7/21/14.

Shelley Coston, County Clerk
Bell County, Texas
by Deputy KETTERMA

*[signature]*

Instruments associated with this case are available upon request for an additional charge, $1 per page (additional $1 per case for certification). For cases filed prior to 2002, only the judgment is available. Please visit or contact the County Clerk's Office at (254) 933-5170 to request copies.

bcccrsltr
CKW3PFK

370032

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS

The Complainant, Jack G. Mazzuca, having personally appeared and been duly sworn by me, the undersigned authority, stated upon oath that I have good reason to believe and do believe

AND I THEREFORE CHARGE THAT Thomas Christopher Retzlaff, hereinafter referred to as Defendant, on or about the 31st day of January, 1997, A.D., in Bell County, Texas knowing that the material was harmful, and knowing that Ashlee Cooke was a minor, did then and there intentionally, knowingly, and recklessly exhibit to said minor, harmful material and knowing that the material was harmful, did then and there intentionally, knowingly and recklessly display harmful material and was reckless about whether said minor was present who would be offended and alarmed by this display,

AGAINST THE PEACE AND DIGNITY OF THE STATE.

2C97 1672

_____
COMPLAINANT

Sworn to and subscribed before me this 19th day of March, 1997, A.D.

_____
ASSISTANT COUNTY ATTORNEY
BELL COUNTY, TEXAS

JUSTICE OF THE PEACE
PRECINCT_____, PLACE_____
BELL COUNTY, TEXAS

NOTARY PUBLIC IN AND FOR
BELL COUNTY, TEXAS
MY COMMISSION EXPIRES_____

OFFENSE:   SALE, DISTRIBUTION, OR DISPLAY        PENALTY:   CLASS   A
           OF HARMFUL MATERIAL TO A MINOR

STATUTE:   PENAL CODE 43.24

FILED FOR RECORD

MAR 2 0 1997

VADA SUTTON
CO. CLK. BELL CO. TX

2807-T

FILED FOR RECORD

MAR 2 0 1997

VADA SUTTON
CO. CLK. BELL CO. TX

NO. _____

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE JUSTICE COURT |
| VS. | * | OF |
| <u>Thomas Christopher Retzlaff</u> | * | BELL COUNTY, TEXAS |

## APPLICATION AND AFFIDAVIT FOR ARREST WARRANT

THE STATE OF TEXAS    *

COUNTY OF BELL    *

2C97 1672

The undersigned Affiant, a Peace Officer licensed in the State of Texas, herein requests this Court to issue a warrant of arrest for the above named Defendant, and in support thereof, and being duly sworn, upon oath, makes the following statements and accusations in support of said request:

1. There is herein described, the following suspected party, to wit: Thomas Christopher Retzlaff; W/M; DOB: ▆▆▆▆▆▆; 5'9"; 165 lbs; brown hair, brown eyes; TX DL ▆▆▆▆▆▆▆, SSN: ▆▆▆▆▆▆▆, LKA: #507, 2602 S. 39th Street, Temple, TX

2. It is the belief of the Affiant and he hereby charges and accuses that the said Defendant has violated the laws of the State of Texas, as follows:
That the said Defendant, on or about the <u>31st</u> day of <u>January</u>, <u>1997</u>, and before the making and filing of this affidavit, did then and there in Bell County, Texas, knowing that the material was harmful, and knowing that ▆▆▆▆▆▆▆▆▆ was a minor, did then and there intentionally, knowingly, and recklessly exhibit to said minor, harmful material and knowing that the material was harmful, did then and there intentionally, knowingly and recklessly display harmful material and was reckless about whether said minor was present who would be offended and alarmed by this display,

AGAINST THE PEACE AND DIGNITY OF THE STATE.

3. Affiant has probable cause for said belief by reason of the following facts, to wit:

1) Your affiant Jack G. Mazzuca, investigator with the Bell County Attorney's Office has reviewed the reports and investigation of officers Chris Fitzner and Lila Price. They are both licensed Texas Peace Officers, employed by the Temple Police Department. I believe they are both reliable and credible individuals. Their reports reveal that the defendant, Thomas Christopher Retzlaff, on or about January 31, 1997, rented a video movie titled, "Heavy Metal" from the Hollywood Video Store at 3150 So. 31st Street, Temple, Texas. The reports further reveal that during that evening, four minor children were at the defendant's residence."

2C97 1672

3.   Probable cause, cont'd

Those minor children are: ███████████ 11 years of age, ███████
██████, 9 years of age, Brittany Retzlaff, 9 years of age, and
Collin Retzlaff, believed to be 6 years of age.

   2)   During that evening, the defendant asked the children to
watch a movie with him.  The movie is titled "Heavy Metal".  The
reports further reveal that this is an animated movie, that it
contains scenes of some of the characters fully nude, and also
scenes of the characters engaging in sexual intercourse.  This
video was shown at the defendant's residence at #507, 2602 South
39th Street, Temple, Bell County, Texas.

   3)   I have reviewed the statements of Brittany Retzlaff,
████████████ and ████████████████ all of whom I believe to be
reliable and credible witnesses.  They identified the movie and
fully described the scenes of nudity and sexual intercourse and
indicated that the defendant showed them the movie.  ████████████
██████ stated, "The cartoon showed women's breasts, the hair on
their privates and showed a naked boy and his private parts."
She further stated, "It showed a man and a woman having it
together.  The man and the woman were laying down.  They didn't
have any clothes on.  Their whole bodies were touching.  They were
moving up and down.  I don't know that is called, it is a very
nasty movie."  ████████████████████ statement also indicates that the
defendant called the children into the living room to watch the
movie.  ████████████████told him, "I don't know if my mom would want
me to watch this."  The defendant told her that it was alright,
that it was just a cartoon.

   4)   I believe the movie shown to the children depicted
material whose dominant theme taken as a whole, is patently
offensive to prevailing standards in the adult community as a whole
with respect to what is suitable for minors; appeals to the
prurient interest of a minor in sex, nudity or excretion; and is
utterly without redeeming social value for minors.

   WHEREFORE, Premises Considered, Affiant asks for issuance of a
warrant of arrest for the above named Defendant for the foregoing
misdemeanor offense.

_____
                              Affiant

   SUBSCRIBED AND SWORN TO before me this 19th day of March,
1997.

_____
Notary Public, State of Texas
My commission expires

TAMMY R. MILLS
NOTARY PUBLIC
State of Texas
Comm. Exp. 04-16-97

FILED FOR RECORD

MAR 2 0 1997

VADA SUTTON
CO. CLK. BELL CO. TX

2C97 1672

INFORMATION - GENERAL

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

I, Richard J. Miller, County Attorney, of the County of Bell, State of Texas, on the written affidavit of Jack G. Mazzuca, a competent and credible person herewith filed in the County Court-At-Law No. 2, of Bell County, Texas, do present in and to said Court: That in the County of Bell, State of Texas, on or about the 31st day of January, 1997, A.D., and anterior to the filing of this information, one Thomas Christopher Retzlaff, the defendant, knowing that the material was harmful, and knowing that ▆▆▆▆▆▆ ▆▆▆▆▆ was a minor, did then and there intentionally, knowingly, and recklessly exhibit to said minor, harmful material and knowing that the material was harmful, did then and there intentionally, knowingly and recklessly display harmful material and was reckless about whether said minor was present who would be offended and alarmed by this display,

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Richard J. Miller
County Attorney, Bell County, Texas

By: _____
      Assistant County Attorney

FILED FOR RECORD

MAR 2 0 1997

VADA SUTTON
CO. CLK. BELL CO. TX

S#
5147
2.00

NO. 2C97-1672

STATE OF TEXAS                  §        IN THE COUNTY COURT
                                §
VS.                             §        AT LAW, NO. 2
                                §
THOMAS CHRISTOPHER RETZLAFF     §        BELL COUNTY, TEXAS

FILED FOR RECORD
MAY 07 1997
VADA SUTTON
COUNTY CLK., BELL CO. TEXAS

MOTION TO DISMISS

TO THE HONORABLE JUDGE OF THIS COURT:

     THOMAS CHRISTOPHER RETZLAFF, Defendant in the above cause,
excepts to and moves the Court to set dismiss the prosecution based
upon the information filed herein on the following grounds:


                              I.


     On or about April 18, 1997 Bell County Sheriff's deputies
seized all defendant's notes and documents.  The documents seized
include defendant's recordings of his thought processes and
preparation for trial in this cause, the other pending criminal
cases, and other pending legal actions.  Also included in the items
seized were notes of information defendant intended to pass along
to his attorney, correspondence from his attorney, and
communications defendant intended for his spouse.


                              II.


     Said seizure of information violates the protections afforded
the defendant by the Constitutions of the State of Texas and the
United States; as well as the Texas Code of Criminal Procedure.
Specifically, the seizure and review of items complained of herein
violated defendants rights to be free from unreasonable search and
seizure, right to counsel and rights against self-incrimination.


                              III.


     The nature and level of intrusion is such that mere supression
of the evidence seized is insufficient.   By intruding upon
defendant's thought processes and trial strategies, the State has
gained illegal insight into the manner by which defendant intended
to refute the State's allegations.  Beyond the mere possession of
protected evidence, this case involves the monitoring of
defendant's thoughts and preparations for trial.  Because the State
has penetrated defendant's theories about the approach to trial and
seized his preparation, it has the defense strategy, which is
strictly protected under our entire justice system.

WHEREFORE, Defendant prays that this motion to dismiss be granted and the prosecution be dismissed.

RESPECTFULLY SUBMITTED,

PAUL L. LePAK
106 N. EAST STREET
BELTON, TX 76513
(817) 933-2255
FAX: (817) 933-3421
SBN: 12216750

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion has been hand-delivered to the Office of the County Attorney for Bell County, Texas, Bell County Courthouse, on this the 12th day of _____ M A Y _____, 1997.

Paul L. LePak

2C97–1672

| | | |
|---|---|---|
| THE STATE OF TEXAS | ╏ | IN THE COUNTY COURT AT LAW #2 |
| VS. | ╏ | IN AND FOR |
| Thomas Christopher Retzlaff | ╏ | BELL COUNTY, TEXAS |

## JUDGMENT

On this the 2nd day of September, 1997, the above entitled and numbered cause was regularly reached and called for trial when came the State of Texas by her County Attorney and the Defendant in person WITH/~~WITHOUT~~ counsel and both parties announced ready for trial; thereupon the Defendant waived a jury and the Court consented to the waiver of jury herein; and thereupon the Defendant waived the reading of the information and the Court consented to the waiver of the reading of the information; thereupon when asked by the Court as to how the Defendant pleaded, the Defendant entered a plea of "Guilty" to the offense in the information relied upon by the State and thereupon the Defendant was admonished by the Court of the consequences of said plea including the maximum and minimum punishment attached to the offense relied upon by the State, that any recommendation of the prosecuting attorney as to the punishment assessed by the Court does not exceed the punishment recommended by the State and agreed to by the Defendant and his attorney, the Court must give its permission to the Defendant before he may prosecute an appeal on any matters in the case except for those matters raised by written motion filed prior to trial that were ruled on by the Court; and it appearing to the Court that the said Defendant is competent to stand trial and that the Defendant is not influenced in making said plea out of fear or persuasion or delusive hope of pardon promoting him to confess his guilt, the said plea of "Guilty" is by the Court received now entered of record in the minutes of the Court as the plea herein of said Defendant; and the Court, after having heard all evidence for the State and Defendant and the argument of counsel, is of the opinion and so finds that the said Defendant is guilty as confessed of the offense alleged in the information herein.

It is therefore Considered, Ordered, Adjudged, and Decreed by the Court that the said Defendant is guilty of the offense of DISPLAY OF HARMFUL MATERIAL TO A MINOR,                        and that the said Defendant committed the said offense on the 31st day of   January, 1997, as confessed in said plea of guilty herein made, and that the punishment be fixed as determined by the Court, by confinement in the Bell County Jail for a period of 325 days and by a fine of   $100.00, plus costs of court.

SIGNED AND ENTERED ON THIS THE  2nd day of September, 1997.

_____
JUDGE PRESIDING

CR–75–82

2C97—1672

| THE STATE OF TEXAS | | IN THE COUNTY COURT AT LAW #2 |
| VS. | | IN AND FOR |
| Thomas Christopher Retzlaff | | BELL COUNTY, TEXAS |

## SENTENCE

   On this the  2nd day of September, 1997, this cause being again called, the State appeared by her County Attorney and the Defendant appeared in open Court in person WITH/WITHOUT counsel present for the purpose of having the sentence of law pronounced in accordance with the Judgment herein rendered and entered against him.  And thereupon the Defendant was asked by the Court whether he had anything to say why said sentence should not be pronounced against him and he answered nothing in bar thereof. Whereupon the Court proceeded, in the presence of the said Defendant to pronounce sentence against Defendant as follows:

   It is the Order of this Court that the Defendant who has been adjudged to be guilty of DISPLAY OF HARMFUL MATERIAL TO A MINOR,                            and whose punishment has been assessed at a fine of    $100.00, plus   $157.00 costs of court, and at confinement in the Bell County Jail for 325 days, be delivered to the Sheriff of Bell County, Texas, today, to be confined in the said Bell County Jail in accordance with the provisions of the law governing the jail and the keeping of prisoners. It is the further order of this Court that the Defendant shall be given credit for _116_ days towards the completion of this sentence which is the time the Defendant served in jail waiting trial in this cause up to and including the day of this sentence.

   Said fine and costs shall be paid by the Defendant to the County Clerk as follows: Pay $257.00 in jail, fine and court cost are to run concurrent with jail sentence.

   ENTERED AND SIGNED ON THIS THE  2nd day of September, 1997.

_____
JUDGE PRESIDING

| Court Costs———————— | $103.00 |
| State Costs—————— | $19.00 |
| Crime Fund Costs——— | $35.00 |
| Total—————————— | $157.00 |

Restitution:
To:

FILED FOR RECORD

SEP – 3 1997

VADA ························
CO. CLK. BELL CO. TX.

CR–74R–85

# EXHIBIT 16

8/12/2014

Case5:14-cv-01059-BLF Document35-3 Filed08/14/14 Page12 of 90
TCR v. BELL CTY. DIST. ATTORNEY'S OFFICE, 305 SW 3d 661 - Tex Court of Appeals, 3rd Dist. 2009 - Google Scholar

305 S.W.3d 661 (2009)

## T.C.R., Appellant,
### v.
## BELL COUNTY DISTRICT ATTORNEY'S OFFICE, Appellee.

### No. 03-08-00627-CV.

Court of Appeals of Texas, Austin.

August 6, 2009.

663  *663 T.C.R., San Antonio, pro se.

Bob D. Odom, Asst. Dist. Atty., Belton, for Appellee.

Before Justices PATTERSON, PEMBERTON and WALDROP.

# *OPINION*

BOB PEMBERTON, Justice.

This appeal presents an issue—apparently of first impression—regarding the requirements for expunction under article 55.01(a)(2) of the code of criminal procedure, as amended in 2001. Tex.Code Crim. Proc. Ann. art. 55.01(a)(2) (West 2006); *see* Act of May 29, 1989, 71st Leg., R.S., ch. 803, § 1, 1989 Tex. Gen. Laws 3666, 3666 (amended 2001) (current version at Tex.Code Crim. Proc. Ann. art. 55.01(a)). Appellant T.C.R. appeals a district court order denying his petition to expunge records related to his arrests on two felony charges from the 1990s that were ultimately dismissed in connection with his plea bargains in other cases. The sole issue in dispute is whether T.C.R. could satisfy paragraph (A) of article 55.01(a)(2) by proving that the limitations periods for the felony charges he seeks to expunge expired before he filed his expunction petition, as required by subparagraph (i) of paragraph (A), *see* Tex.Code Crim. Proc. Ann. art. 55.01(a)(2)(A)(i), or whether he must instead obtain a finding that the charges were dismissed because their presentment had been made because of mistake, false information, or other similar reason indicating absence of probable cause at the time of dismissal to believe he committed the offense, or the charging instrument was void, as required in subparagraph (ii) of paragraph (A). *See id.* art. 55.01(a)(2)(A)(ii). The district court found that T.C.R. had failed to prove the requirements of subparagraph (ii) and denied his petition for that reason alone. Because we conclude that article 55.01(a)(2) also permits T.C.R. to satisfy paragraph (A) by proving the requirements in subparagraph (i), and because there is no dispute that he met those requirements and the other conditions for expunction under article 55.01(a)(2), we reverse the order denying expunction and remand for entry of an order granting expunction.

Expunction—the remedy through which a person who has been arrested for the commission of an offense can have all information about the arrest removed from the State's records—is not a constitutional or common-law right, but purely a statutory privilege. *See Heine v. Texas Dep't of Pub. Safety,* 92 S.W.3d 642, 648 (Tex.App.-Austin 2002, pet. denied); *McCarroll v. Texas Dep't of Pub. Safety,* 86 S.W.3d 376, 378 (Tex.App.-Fort Worth 2002, no pet.); *Harris County Dist. Attorney v. Lacafta,* 965 S.W.2d 568, 569 (Tex. App.-Houston [14th Dist.] 1997, no pet.). Article 55.01(a) of the code of criminal procedure creates a cause of action through which a person can establish an entitlement to expunction. *See* Tex.Code Crim. Proc. Ann. art. 55.01(a); *Heine,* 92 S.W.3d at 648. Although article 55.01 is located in the code of criminal procedure, the cause of action it creates is civil rather than criminal in nature. *Texas Dep't of Pub. Safety v. J.H.J.,* 274 S.W.3d 803, 806 (Tex.App.-Houston [14th Dist.] 2008, no pet.). Article 55.01 imposes a number of conditions or elements that the petitioner has the burden of proving; unless the petitioner meets each element, there is no right to the expunction remedy. *Id.; Harris County Dist. Attorney's Office v. Hopson,* 880 S.W.2d 1, 3 (Tex.App.-Houston [14th

Case5:14-cv-01059-BLF Document35-3 Filed08/14/14 Page13 of 90

Dist.] 1994, no writ). The trial court must strictly comply with the statutory requirements, and it has no equitable power to expand the remedy's availability beyond what the legislature has provided. *Lacafta*, 965 S.W.2d at 569; *Harris County*

664 *664 *Dist. Attorney's Office v. M.G.G.*, 866 S.W.2d 796, 798 (Tex.App.-Houston [14th Dist.] 1993, no writ). Conversely, if the petitioner demonstrates that he has satisfied each of the requirements under article 55.01(a), the trial court has a mandatory duty to grant the expunction petition. *Heine*, 92 S.W.3d at 648.

In his verified petition for expunction[1] filed on March 27, 2008, T.C.R. pled that he had been arrested on February 2, 1997 for the offense of burglary of a habitation allegedly committed on the same day, and arrested in April of that year for allegedly committing the offense of sexual assault in April 1996. T.C.R. sought expunction of records relating to these arrests under the following provisions of article 55.01(a):

> Art. 55.01. RIGHT TO EXPUNCTION. (a) A person who has been placed under a custodial or noncustodial arrest for commission of either a felony or misdemeanor is entitled to have all records and files relating to the arrest expunged if:
>
> * * *
>
> (2) each of the following conditions exist:
>
> (A) an indictment or information charging the person with commission of a felony has not been presented against the person for an offense arising out of the transaction for which the person was arrested or, if an indictment or information charging the person with commission of a felony was presented, the indictment or information has been dismissed or quashed, and:
>
> (i) the limitations period expired before the date on which a petition for expunction was filed under Article 55.02; or
>
> (ii) the court finds that the indictment or information was dismissed or quashed because the presentment had been made because of mistake, false information, or other similar reason indicating absence of probable cause at the time of the dismissal to believe the person committed the offense or because it was void;
>
> (B) the person has been released and the charge, if any, has not resulted in a final conviction and is no longer pending and there was no court ordered community supervision under Article 42.12 for any offense other than a Class C misdemeanor; and
>
> (C) the person has not been convicted of a felony in the five years preceding the date of the arrest.

Tex.Code Crim. Proc. Ann. art. 55.01(a)(2). T.C.R. pled—and, at the subsequent hearing, presented evidence[2]—that he had been indicted for both offenses and that the indictments had been dismissed, *see id.* art. 55.01(a)(2)(A); that the limitations period for these offenses had expired before he filed his expunction petition (i.e., the requirements of paragraph (A), subparagraph (i)), *see id.* art. 55.01(a)(2)(A)(i); that he had been released from custody, the charges did not result in a final conviction and were no longer pending, and there was no court-ordered community supervision

665 under article 42.12, *see id.* art. 55.01(a)(2)(B);[3] and that he had not been convicted of a felony during the five years *665 preceding the two arrests for which he sought expunction. *See id.* art. 55.01(a)(2)(C). T.C.R. did not plead or attempt to prove that he satisfied the requirements of subparagraph (ii) of paragraph (A)—that the indictments had been dismissed because their presentment had been made because of reasons indicating absence of probable cause or because they were void. *See id.* art. 55.01(a)(2)(A)(ii).

The State did not dispute that T.C.R. had satisfied each of the article 55.01(a)(2) conditions that he had attempted to prove. Instead, it presented evidence that T.C.R. could not satisfy subparagraph (ii) of paragraph (A)—the requirement that T.C.R. had not attempted to prove. The State presented uncontroverted evidence that both of the charges for which T.C.R. sought expunction had been dismissed in connection with his plea bargains in other cases. This evidence

included the dismissal orders in both cases.[4] The dismissal order in the burglary case reflects that, on April 10, 1997, the district court dismissed the cause on the State's motion, which cited the sole ground that:

> The Defendant plead in cause number #47,206 wherein the plea agreement provided in part as follows:

> The State shall dismiss the indicted burglary of a habitation case currently pending against defendant after he is sentenced in this cause and shall not prosecute said offenses if defendant does not violate his community supervision if granted by this court.[5]

Similarly, the dismissal order in the sexual assault case reflects that, on August 29, 1997, the district court dismissed the cause on the State's motion, which cited the ground of "INTEREST OF JUDICIAL ECONOMY IN CONJUNCTION WITH PLEA IN ANOTHER CASE."[6]

In a prior attempt by T.C.R. to expunge records relating to these arrests, we affirmed the district court's denial of expunction on the basis that T.C.R. could not prove the indictments had been dismissed because of reasons indicating absence of probable cause or because they were void. However, at the time of that proceeding, paragraph (A) of article 55.01(a)(2) required T.C.R. to prove the following:

> (A) an indictment or information charging him with commission of a felony has not been presented against him for an offense arising out of the transaction for which the person was arrested or, if an indictment or information charging him with commission of a felony was presented, it has been dismissed and the court finds that it was dismissed because the presentment had been made because of mistake, false information, or other similar reason indicating absence of probable cause at the time of the dismissal to believe the person committed the offense or because it was void;

666   Act of May 29, 1989, 71st Leg., R.S., ch. 803, § 1, 1989 Tex. Gen. Laws 3666, 3666 (amended 2001) (current version at Tex. Code Crim. Proc. Ann. art. 55.01(a)). Under this version of paragraph (A), it was *666 clear that because "an indictment ... charging [T.C.R.] with commission of a felony was presented" and dismissed, he had to prove that "it was dismissed because the presentment had been made because of mistake, false information, or other similar reason indicating absence of probable cause at the time of the dismissal to believe the person committed the offense or because it was void." However, in 2001, the legislature amended paragraph (A) as follows:

> (A) an indictment or information charging the person with commission of a felony has not been presented against the person for an offense arising out of the transaction for which the person was arrested or, if an indictment or information charging the person with commission of a felony was presented, the indictment or information has been dismissed or quashed and:

> (i) the limitations period expired before the date on which a petition for expunction was filed under Article 55.02; or

> (ii) the court finds that the indictment or information was dismissed or quashed because the presentment had been made because of mistake, false information, or other similar reason indicating absence of probable cause at the time of the dismissal to believe the person committed the offense or because it was void;

Act of May 27, 2001, 77th Leg., R.S., ch. 1021, § 1, 2001 Tex. Gen. Laws 2236, 2237 (codified at Tex.Code Crim. Proc. Ann. art. 55.01) (additions italicized).[7] Thus, among other changes, the legislature added the requirement that the limitations period for the offense has expired before the expunction petition is filed, which it placed in a new subparagraph (i) immediately following the preexisting language regarding presentment and dismissal of an indictment or information, separated by the conjunction "and." The preexisting requirement that petitioners prove the dismissal was for a reason indicating absence of probable cause or that the charging instrument was void, which previously followed the conjunction "and" after the language regarding dismissals of charging instruments, was separated from that language and moved to a new subparagraph (ii), with subparagraph (i) in between, with the two

8/12/2014

Case5:14-cv-01059-BLF Document35-3 Filed08/14/14 Page15 of 90
TCR v. BELL CTY. DIST. ATTORNEY'S OFFICE, 305 SW 3d 661 - Tex Court of Appeals, 3rd Dist. 2009 - Google Scholar

subparagraphs separated by the disjunctive "or." The legislature made the 2001 amendments fully applicable "to arrest records and files created before, on, or after the effective date of this Act," September 1, 2001. *See id.* § 4, 2001 Tex. Gen. Laws at 2237 ("The change in law made by this Act applies to arrest records and files created before, on or after the effective date of this Act."); § 5, 2001 Tex. Gen. Laws at 2237 ("This Act takes effect... September 1, 2001."). Consequently, they govern T.C.R.'s expunction claim here.

During the intervening years, it has been established that the 2001 addition of subparagraph (i) to paragraph (A) imposed a new requirement that a person seeking expunction of arrest records where a felony charging instrument has *not* been presented—including misdemeanor cases— must prove that the limitations period for the charge had expired before he filed his expunction petition. *State v. Beam*, 226 S.W.3d 392, 394 (Tex.2007). T.C.R. and the State joined issue as to subparagraph (i)'s application in cases where an indictment or information charging a felony *has* been

667 presented and dismissed. T.C.R. took the position that subparagraphs (i) *667 and (ii) are now alternative means of satisfying paragraph (A), and that he thus met that requirement through his proof that the limitations periods on his offenses had expired before he filed his expunction petition. *See* Tex.Code Crim. Proc. Ann. art. 55.01(a)(2)(A)(i). The State countered that subparagraph (i) applies only in cases where no indictment or information charging a felony has been presented and not when, as here, an indictment is presented and later dismissed. In those cases, the State reasoned, the requirements in subparagraph (ii) continued to govern. Consequently, it urged, T.C.R.'s inability to prove subparagraph (ii)'s requirements is fatal to his expunction claim.

After taking the matter under advisement, the district court signed an order denying T.C.R.'s petition and subsequently entered findings of fact and conclusions of law. The district court found that T.C.R. had failed to satisfy the requirements in subparagraph (ii) of paragraph (A):

1. That Cause No. 47,176 [the burglary charge] was dismissed by the 264th District Court of Bell County, Texas on April 10, 1997 for the reason that the dismissal was expressly made a part of the plea bargain in Cause No. 47,206 [the illegal weapon charge] pending in said court and that Petitioner entered his plea [of] guilty in Cause No. 47,206 in accordance with that plea bargain and the terms of the plea bargain, to include the dismissal of Cause No. 47,176, were followed by the court.

2. That Cause No. 47,563 [the sexual assault charge] was dismissed by the 264th District Court of Bell County, Texas on August 29, 1997 on the grounds that it was in the interest of judicial economy in conjunction with Petitioner's plea in another case.

3. Neither Cause No. 47,176 or Cause No. 47,563 were dismissed because presentment was made because of mistake, false information or other reason indicating absence of probable cause at the time of the dismissal to believe the person committed the offense or because it was void. Both dismissals were entered because Petitioner was or had entered pleas in another case, either as part of the plea bargain in the other case or as a direct result of his plea in that case.

Based on these fact findings, the district court concluded that T.C.R. had failed to satisfy the requirements of article 55.01(a)(2), paragraph (A):

1. Because the dismissals in both Cause Nos. 47,176 and 47,563 were entered as part of the plea bargain in, or as a result of, Petitioner's plea to another charge in a separate case and not due to a mistake, false information or similar reason indicating an absence of probable cause at the time of the dismissal to believe that Petitioner had committed the offenses in Cause Nos. 47,176 and 47,563 or because the indictments in said causes were void, they are not qualified for expunction pursuant to Article 55.01(a)(2)(A) of the Texas Code of Criminal Procedure.

T.C.R. brings a single issue on appeal challenging the district court's order. As in the district court, the sole disputed issue on appeal is whether article 55.01(a)(2), paragraph (A) requires T.C.R. to prove the conditions in subparagraph (ii), as the State urges, or is satisfied by T.C.R.'s proof that he met the limitations condition of subparagraph (i). Neither party cites a case that has squarely decided this question,[8] and we are aware of none.[9]

Case5:14-cv-01059-BLF   Document35-3   Filed08/14/14   Page16 of 90
TCR v. BELL CTY. DIST. ATTORNEY'S OFFICE, 305 SW 3d 661 - Tex Court of Appeals, 3rd Dist. 2009 - Google Scholar

668    *668 Our resolution of this question turns on construction of paragraph (A), as it was amended in 2001. Statutory construction presents a question of law that we review de novo. See State v. Shumake, 199 S.W.3d 279, 284 (Tex.2006). Although we apply an "abuse-of-discretion" standard when reviewing the district court's ruling on T.C.R.'s expunction petition, see Heine, 92 S.W.3d at 646, here this means only that we review the district court's interpretation

669    *669 and application of paragraph (A) de novo, as with any statutory-construction issue, because a "trial court has no 'discretion' in determining what the law is or applying the law to the facts," Walker v. Packer, 827 S.W.2d 833, 840 (Tex.1992), and, therefore, "abuses its discretion" if it misinterprets or misapplies the law. Perry Homes v. Cull, 258 S.W.3d 580, 598 (Tex.2008); Walker, 827 S.W.2d at 840.

Our primary objective in statutory construction is to give effect to the legislature's intent. See Shumake, 199 S.W.3d at 284. We seek that intent "first and foremost" in the statutory text. Lexington Ins. Co. v. Strayhorn, 209 S.W.3d 83, 85 (Tex.2006). "When text is clear, text is determinative of that intent." Entergy Gulf States, Inc. v. Summers, 282 S.W.3d 433, 437 (Tex.2009) (op. on reh'g) (citing Shumake, 199 S.W.3d at 284; Alex Sheshunoff Mgmt. Servs. v. Johnson, 209 S.W.3d 644, 651-52 (Tex.2006)). We consider the words in context, not in isolation. State v. Gonzalez, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26 (Tex.2008) (citing Texas Dep't of Transp. v. City of Sunset Valley, 146 S.W.3d 637, 642 (Tex.2004); Taylor v. Firemen's & Policemen's Civil Serv. Comm'n of City of Lubbock, 616 S.W.2d 187, 189 (Tex.1981); University of Tex. Sw. Med. Ctr. v. Loutzenhiser, 140 S.W.3d 351, 356 (Tex.2004)); see Entergy Gulf States, 282 S.W.3d at 437 ("This general rule [that text is determinative of legislative intent] applies unless enforcing the plain language of the statute as written would produce absurd results"; also recognizing that legislative definitions of terms control over their ordinary meaning); Tex. Gov't Code Ann. § 311.011 (West 2005) ("[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage"). We should also read every word, phrase, and expression in a statute as if it were deliberately chosen, and likewise presume that words excluded from the statute are done so purposefully. See Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist., 81 S.W.3d 869, 873 (Tex.App.-Austin 2002, pet. denied). Our analysis of the statutory text is also informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," Tex. Gov't Code Ann. § 311.021(2) & (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, and "consequences of a particular construction." Id. § 311.023(1), (2), (3), (5) (West 2005). However, only when the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" Entergy Gulf States, 282 S.W.3d at 437 (quoting In re Estate of Nash, 220 S.W.3d 914, 917 (Tex. 2007)).

To support his view of paragraph (A), T.C.R. emphasizes the text and structure of the provision. He observes that paragraph (A) is currently organized into:

   (1) a main paragraph containing two alternatives, separated by the disjunctive "or"—"an indictment or information charging the person with commission of a felony has not been presented against the person for an offense arising out of the transaction for which the person was arrested or, if an indictment or information charging the person with commission of a felony was presented, the indictment or information has been dismissed or quashed";

670    (2) two subparagraphs within paragraph (A) that are also alternatives, separated by the disjunctive "or"—" (i) the limitations *670 period expired before the date on which a petition for expunction was filed under Article 55.02; or (ii) the court finds that the indictment or information was dismissed or quashed because the presentment had been made because of mistake, false information, or other similar reason indicating absence of probable cause at the time of the dismissal to believe the person committed the offense or because it was void";

   (3) with the two sets of alternatives linked by the conjunction "and."

See Tex.Code Crim. Proc. Ann. art. 55.01(a)(2)(A). Paragraph (A)'s language and structure, T.C.R. urges, plainly permits a petitioner to satisfy paragraph (A) by proving either of the two alternatives in the main portion of paragraph (A) and

8/12/2014

Case5:14-cv-01059-BLF Document35-3 Filed08/14/14 Page17 of 90
TCR v. BELL CTY. DIST. ATTORNEY'S OFFICE, 305 SW 3d 661 - Tex Court of Appeals, 3rd Dist. 2009 - Google Scholar

either of the two alternative subparagraphs. Thus, he reasons, he could satisfy paragraph (A) by proving that his indictments had been dismissed (one of the first set of alternatives) "and" the requirements of subparagraph (i) (one of the second set of alternatives).

In response, the State, with reference to its interpretation of paragraph (A), acknowledges that the provision "is perhaps confusing and is inartfully drawn." Nonetheless, it finds support for its interpretation in the fact that subparagraph (ii) can be implicated only when an "indictment or information was dismissed or quashed" (the second alternative in the main body of paragraph (A)), and it can never be implicated when an indictment or information charging a felony is not presented (the first alternative). The State observes that, similarly, only subparagraph (i) can apply when no indictment or information charging a felony is presented. These relationships, the State reasons, imply that subparagraph (i) applies exclusively in cases when no indictment or information is presented, just as subparagraph (ii) applies exclusively in cases where an indictment or information is presented and dismissed or quashed. This construction, the State adds, is consistent with the legislature's intent in article 55.01, which it views as "allow[ing] persons who have been *wrongfully arrested* to expunge their arrest records." (Emphasis in original). That purpose is achieved, the State argues, by requiring persons who have been indicted—which "involves a determination that there is sufficient evidence or probable cause to go to trial"—to establish the indictment was ultimately dismissed for lack of probable cause, as required by subparagraph (ii), and not merely that "the case [was] dismissed only for a reason that does not call into question the rightfulness of the arrest." By contrast, the State further reasons, subparagraph (i) "more logically applies ... where no indictment or information is ever presented [s]ince there is never a determination of probable cause or as to the sufficiency of the evidence to go to trial."

We are to adhere to the plain meaning of statutory text as the most reliable guide to legislative intent. *Entergy Gulf States*, 282 S.W.3d at 437. Here it guides us to agree with T.C.R.'s construction of paragraph (A). As amended in 2001, paragraph (A) plainly requires that a person seeking expunction prove (1) that no indictment or information charging a felony has been presented, "*or*," if one has been presented, that it has been dismissed or quashed; "*and*" (2) that the conditions in subsection (i) "*or*" (ii) have been satisfied. Thus, where "an indictment or information charging the person with commission of a felony was presented," paragraph (A) is satisfied with proof that (1) "the indictment or information has been dismissed or quashed" *and* (2) either the limitations period has expired on or before the date on which a
671   petition for expunction was filed, as required in subparagraph (i), *or* that the dismissal was for reasons indicating *671 absence of probable cause or that the charging instrument was void, as required in subparagraph (ii). See *Pitts v. State*, 113 S.W.3d 393, 396 n. 1 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (suggesting that subparagraphs (i) and (ii) are alternatives in cases where an indictment has been presented and dismissed); *see also In re Expunction Request*, No. 06-09-00002-CV, 2009 WL 1530815, at *2-3, 2009 Tex.App. LEXIS 4027, at *7 (Tex.App.-Texarkana June 3, 2009, no pet. h.) (mem. op.) (stating that subparagraphs (i) and (ii) are "alternative" elements in case where neither was established). We also observe that the legislature did not specify or require any particular ground for dismissal or quashing in its requirement that "the indictment or information has been dismissed or quashed." Considering that phrase together with subparagraph (i), the legislature plainly provided that a person can satisfy paragraph (A) by proving that the indictment had been dismissed or quashed, without regard to the reason, and limitations had run on the offense before he filed his expunction petition.[10]

It is true, as the State emphasizes, that subparagraph (ii) applies only when an indictment or information charging a felony has been presented, which means that not all combinations of the two sets of alternatives in paragraph (A) are possible. However, it does not follow that *only* subparagraph (ii), and not subparagraph (i), can apply in cases where an indictment or information has been presented. The legislature did not place any such limitation in subparagraph (i) or in the requirement that "the indictment or information has been dismissed or quashed," though it easily could have done so. See *Gables Realty Ltd. P'ship*, 81 S.W.3d at 873 (we presume that legislature acted purposefully in choosing to include or exclude words from statute). As for the State's view of an implicit limitation to this effect, it is inconsistent with the plain language of paragraph (A), which is satisfied if an indictment has been dismissed or quashed, and the conditions of either subparagraph (i) *or* (ii) are satisfied.

As for the State's arguments regarding the legislative intent underlying article 55.01, it is true that a primary goal of this statute is "to permit the expunction of records from wrongful arrests." *Harris County Dist. Attorney's Office v. J.T.S.*, 807

8/12/2014
Case5:14-cv-01059-BLF Document35-3 Filed08/14/14 Page18 of 90
TCR v. BELL CTY. DIST. ATTORNEY'S OFFICE, 305 SW 3d 661 - Tex Court of Appeals, 3rd Dist. 2009 - Google Scholar

S.W.2d 572, 574 (Tex.1991). However, we cannot conclude that this is a case where reliance on the plain language of the statutory text as written yields an "absurd result" that the legislature could not possibly have intended. See _Entergy Gulf States_, 282 S.W.3d at 437. For one, the legislature has also enacted expunction statutes that condition eligibility not on errors in the criminal justice system against innocent persons, but on an admittedly guilty person's abstaining from committing additional offenses for some period of time after being discharged from the system. See, e.g., Tex.Code Crim. Proc. Ann. arts. 45.0216, .055 (West 2006); see also George E. Dix & Robert O. Dawson, 43B _Texas Practice_ § 48.03 (2001 & 2008-09 Supp.) (contrasting "rehabilitation" and "mistake" models of Texas expunction statutes). The 2001 amendments to paragraph (A), as we have construed them, had the effect of moving article 55.01(a)(2) from a "mistake" model for persons who have been charged with felonies toward more of a "rehabilitation" model. See Tex. Code Crim. Proc. Ann. art. 55.01(a)(2)(A)(i) (requiring that limitations expire before expunction petition is filed), (C)

672 (requiring no felony convictions in five years preceding *672 arrest); but see id. art. 55.01(a)(2)(B) (still requiring petitioner not to have been convicted of offense sought to be expunged and not to have received article 42.12 community supervision). Especially where the legislature has followed this approach in other expunction statutes, it is not absurd or unreasonable to conclude from the statutory text that the legislature intended to make these sorts of changes through the 2001 amendments. We also observe that the legislative history of the 2001 amendments reflects such an intent,[11] as well as legislative awareness of the sorts of potential consequences the State decries here.[12] In short, we must conclude, based on the statutory text, that the legislature, through its 2001 amendments to paragraph (A), made the deliberate policy choice to expand the availability of expunction for persons who have been charged with a felony where the charging instrument has been dismissed or quashed, without regard to the ground or reason, and the limitations period for the offense has expired.[13] We are not at liberty to second-guess this policy judgment in the guise of statutory construction. See, e.g., _Simmons v. Arnim_, 110 Tex. 309, 220 S.W. 66, 70 (1920) ("Courts ... must take statutes as they find them.... They are not the law-making body. They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law ...."); see also _State v. Young_, 265 S.W.3d 697, 703-08 (Tex.App.-Austin 2008, pet. denied).

We hold that, in cases where an indictment or information charging a person with a felony offense has been presented, the person can meet the requirements in paragraph (A) of article 55.01(a)(2), code of criminal procedure, as to that offense by proving that (1) the charging instrument has been dismissed or quashed, and (2) the limitations period for that offense expired before he filed his expunction petition. See Tex.Code Crim. Proc. Ann. art. 55.01(a)(2)(A). There is

673 no dispute that T.C.R. met that burden here,[14] and likewise *673 satisfied the requirements of paragraphs (B) and (C) of article 55.01(a)(2). Consequently, the district court had a mandatory duty to grant T.C.R.'s expunction petition and abused its discretion in denying it. See _Heine_, 92 S.W.3d at 648. We sustain T.C.R.'s sole issue on appeal.

We reverse the district court's denial of T.C.R.'s expunction petition and remand to the district court for the entry of appropriate orders expunging the files and records related to Cause Nos. 47,176 and 47,563. See Tex.Code Crim. Proc. Ann. art. 55.02 (West Supp. 2008).

[1] See Tex.Code Crim. Proc. Ann. art. 55.02 (West Supp. 2008).

[2] T.C.R. testified to these facts and also introduced into evidence, without objection, purported deemed admissions of these facts.

[3] T.C.R. also pled and presented proof that he had not been released on conditional discharge under section 481.109 of the health and safety code.

[4] T.C.R. attached the dismissal orders, as well as the indictments, to his expunction petition, but did not introduce them into evidence.

[5] The State also introduced a February 21, 1997 disclosure of plea recommendation in Cause No. 47,206, signed by both the State and T.C.R. It reflects that T.C.R. had agreed to plead guilty to a felony charge of carrying an illegal knife on school premises in exchange for the State's agreement that, among other things, it would dismiss his pending burglary charge.

[6] The record in this proceeding does not indicate the identity or nature of the "another case" the State was referencing.

Neither dismissal order placed any limitations on T.C.R.'s right to later seek expunction of records concerning those offenses.

[7] There have been additional intervening amendments to article 55.01(a)(2), but these are not material to our analysis.

8/12/2014

Case5:14-cv-01059-BLF   Document35-3   Filed08/14/14   Page19 of 90
TCR v. BELL CTY. DIST. ATTORNEY'S OFFICE, 305 SW 3d 661 - Tex Court of Appeals, 3rd Dist. 2009 - Google Scholar

[8] In the district court, the State cited three cases to support its view that T.C.R. was required to prove the requirements of subparagraph (ii), notwithstanding the 2001 addition of subparagraph (i): *Pitts v. State*, 113 S.W.3d 393 (Tex.App.-Houston [1st Dist.] 2003, no pet.); *Texas Dep't of Pub. Safety v. Collmorgen*, No. 14-06-00478-CV, 2007 WL 853812, 2007 Tex.App. LEXIS 2174 (Tex.App.-Houston [14th Dist.] Mar. 22, 2007, no pet.) (mem. op.); and *Ex parte Lopez*, No. 07-03-00413-CV, 2004 WL 351135, 2004 Tex.App. LEXIS 1786 (Tex.App.-Amarillo Feb. 25, 2004, pet. denied) (mem. op.). Each case is distinguishable. *Lopez* applied the pre-2001 version of paragraph (A). *See* 2004 WL 351135, at *1-2, 2004 Tex.App. LEXIS 1786, at *4-5. *Collmorgen* applied the post-2001 version of paragraph (A), but, because limitations on the charges at issue had not yet run, "the only condition in question [was] whether the indictment was dismissed due to mistake, false information or other similar reason." *See* 2007 WL 853812, at *2, 2007 Tex.App. LEXIS 2174, at *4.

In *Pitts*, the court emphasized that "the focus of the dispute at the evidentiary hearing was appellant's argument that the presentment of the charges brought against him in the 1992 indictment was based on 'mistake, false information, or other similar reason indicating absence of probable cause at the time of the dismissal to believe the person committed the offense,' or that the 1992 indictment was void"—the requirements of subparagraph (ii)—and this likewise was the court's focus on appeal. 113 S.W.3d at 396-400. In a footnote, the *Pitts* court observed that, with reference to subparagraph (i), "[i]t is unclear from the record whether the limitations period for the dismissed offenses, with the exception of [a] murder charge [which has no limitations period], had expired at the time appellant filed his petition for expunction." *Id.* at 396 n. 1. Although the significance of this statement is not entirely clear, in context it appears to refer to a failure by the appellant to meet his burden under subparagraph (i). Such a reference implies that subparagraph (i) would have been an alternative means by which the appellant could have satisfied paragraph (A)—a view consistent with our analysis above.

[9] A potential source of confusion on this issue is footnote 4 of our *Heine* opinion, in which this Court stated, in the context of an expunction claim under the pre-2001 version of paragraph (A) where no indictment or information had been presented:

In cases where an information or indictment has been presented, the petitioner must prove that the indictment/information was dismissed or quashed because the presentment was made due to mistake, false information, or other similar reason indicating absence of probable cause. *See* Tex. Code Crim. Proc. Ann. art. 55.01(a)(2)(A)(ii) (West Supp. 2003); *Ex parte Guajardo*, 70 S.W.3d 202, 204-05 (Tex.App.-San Antonio 2001, no pet.). Thus, if Heine had been indicted for the offense, Heine's burden would have been greater. He would have had to prove that the indictment was dismissed because the presentment had been made due to mistake, false information, or other similar reason indicating absence of probable cause to believe he committed the offense. The [2001] amendment to the statute provides an alternative to this requirement: *in cases where an information or indictment was not presented*, the petitioner must now prove that the limitations period for the offense expired before the filing of the petition for expunction. *See* Act of May 17, 2001, 77th Leg., R.S., ch. 1021, § 1, 2001 Tex. Gen. Laws 2236, 2237 (Tex.Code Crim. Proc. Ann. art. 55.01, since amended).

*Heine v. Texas Dep't of Pub. Safety*, 92 S.W.3d 642, 646 n. 4 (Tex.App.-Austin 2002, pet. denied) (emphasis added). To the extent the italicized reference to subparagraph (i) could imply that this provision applies *only* "in cases where an information was not presented" and not in cases where such a charging instrument is presented and dismissed, it is dicta, as *Heine* was a case where no indictment or information had been presented. *See id.* at 645. More broadly, the entire discussion of the 2001 amendments is dicta because the case was governed by the former version of paragraph (A). *See id.* at 646 n. 4.

[10] We intend no comment, however, as to circumstances in which dismissals could implicate paragraph (B)'s requirement that the charge "has not resulted in a final conviction," as that issue is not before us.

[11] *See* Enrolled Bill Summary, H.B. 1323, 77th Leg., R.S. (2001) ("House Bill 1323 amends the Code of Criminal Procedure to provide that a person is entitled to have all records and files relating to the person's felony or misdemeanor arrest expunged if an indictment or information has been dismissed or quashed and the limitations period has expired."); House Comm. on Crim. Jurisprudence, Bill Analysis, Tex. H.B. 1323, 77th Leg., R.S. (2001) ("House Bill 1323 amends the Code of Criminal Procedure to provide that a person is entitled to have all records and files relating to the person's felony or misdemeanor arrest expunged if an indictment or information has been dismissed or quashed, and the limitations period has expired.").

[12] *See* House Research Org., Bill Analysis, Tex. H.B. 1323, 77th Leg., R.S., at 3 (April 9, 2001) (observing that opponents of amendments had expressed concern that "[g]uilty persons could have their indictments quashed on a technicality and have their arrest records expunged once the statute of limitations for the offense ran out, regardless of whether there was probable cause that the person committed the offense").

[13] Subject, of course, to the other requirements for expunction under article 55.01(a)(2).

[14] We also observe that the district court's fact findings, which were not challenged by either party, establish that T.C.R. satisfied subparagraph (i)'s limitations requirement. The court found that T.C.R.'s burglary charge, which was alleged to have occurred on February 2, 1997, was dismissed on April 10, 1997, while his sexual assault charge, alleged to have occurred on April 25, 1996, was

dismissed on August 29, 1997. The limitations period for burglary is five years from the date of the commission of the offense, *see* Tex.Code Crim. Proc. Ann. art. 12.01(4)(B) (West 2006), while the limitations period for sexual assault is ten years. *See id.* art. 12.01(2)(E). Limitations were tolled during the pendency of each indictment. *See id.* art. 12.05(b) (West 2005). The record reflects that T.C.R. filed his present expunction petition on March 27, 2008, a date more than ten years beyond even the dismissal date of the sexual assault charge and more than five years beyond the dismissal date of the burglary charge.

Save trees - read court opinions online on Google Scholar.

# EXHIBIT 17

8/12/2014

Case5:14-cv-01059-BLF Document35-3 Filed08/14/14 Page22 of 90
Ex parte Retzlaff, 135 SW 3d 45 - Tex Court of Criminal Appeals 2004 - Google Scholar

**135 S.W.3d 45 (2004)**

**Ex Parte Thomas Christopher RETZLAFF, Applicant.**

<u>No. 74,772.</u>

**Court of Criminal Appeals of Texas.**

May 19, **2004.**

46   *46 Thomas Christopher **Retzlaff**, pro se.

47   *47 Jeffrey L. Van Horn, Asst. State Atty., Matthew Paul, State's Atty., Austin, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, JOHNSON and HOLCOMB, JJ., joined.

We withdraw our previous opinion and substitute this opinion. The constitutional issue presented in this writ application is whether notice that a person will be reviewed for release on mandatory supervision at some unspecified time "before [his] projected release date" constitutes timely notice consistent with due process. We hold that it does not.

### I.

Applicant was convicted of Possession of a Weapon in a Prohibited Place[1] in March 1998 and sentenced to eight years in prison. He was eligible for release on discretionary mandatory supervision on April 19, 2001. On December 20, 2000, a parole panel prospectively denied him release on mandatory supervision. Applicant claims that he was not sent notice that a parole panel would be considering whether to release him at that time. The same thing happened in 2001. He was told that a parole panel would review him for release in December, 2001, but a parole panel then voted to deny his mandatory supervision release on November 13, 2001—two weeks before the earliest date he was scheduled to be reviewed. Applicant filed a writ of habeas corpus, alleging that he had been deprived of due process because a parole panel reviewed his case before the month scheduled.[2]

On August 21, 2002, this Court agreed with applicant and granted him what we thought was the appropriate relief— another hearing with sufficient advance notice of its timing so that he would have an opportunity to submit relevant information to the Board of Pardons and Paroles before it made a decision.[3] Ten months later applicant filed another writ complaining that "the Board pulled the same stunt as before." This time, it informed applicant on March 7, 2002, that it would review him for release on mandatory supervision at some unspecified future date, but that he should submit any additional written materials that he would like the Board to review "as soon as possible."[4] That unspecified date

48   turned out to be some ten months later, on *48 January 16, 2003, but applicant was not informed of that date until he received a denial letter afterwards.

Applicant now claims that he "was denied a meaningful opportunity to be heard when the Parole Board conducted a hearing in [his] case on a date for which [he] had not been given notice." He argues that the "ambiguous, vague" notice that he had received on March 7, 2002, was "was just as defective" as the notice he had received in 2001, and that the Board therefore violated his right to due process under the Fifth and Fourteenth Amendments.

### II.

From 1977 until 1987, an eligible inmate whose "actual calendar time" plus "accrued good conduct time" equaled the term of his sentence was *automatically* released on mandatory supervision and treated as if he were on parole.[5] " [M]andatory supervision was originally created to ensure parole custody for all prisoners in order to prevent recidivism." [6] It was intended to provide the inmate with a supervised transition from prison to the local community and to ensure that parole officers would provide the releasee with guidance, control, assistance, and support. Beginning in 1987, amendments to that statute made some inmates, those convicted of especially serious offenses and those who had used a deadly weapon in committing their crime, ineligible for release on mandatory supervision.[7] Those inmates were either released on regular parole or required to serve their entire sentence. Nonetheless, some of those who were required to be released on mandatory supervision were not rehabilitated and still constituted a danger to the public.

Therefore, in 1995, the Texas Legislature amended the mandatory supervision statute to permit a parole panel to exercise some discretion in deciding whether a person who was eligible for release on mandatory supervision should, nonetheless, be kept in custody.[8] Under the revised Government Code section, "[a]n inmate may not be released to mandatory supervision if a parole panel determines that:

(1) the inmate's accrued good conduct time is not an accurate reflection of the inmate's potential for rehabilitation; and

(2) the inmate's release would endanger the public."[9]

This statute is a "failsafe" mechanism to protect society from the inappropriate release of those who are not truly rehabilitated and who would constitute a present danger to the public. Under the current provision, an inmate who is eligible for release on mandatory supervision will be released *unless* the parole panel makes these two specific findings. Given the wording of the statute, an eligible inmate has a vested, statutory entitlement to release on mandatory supervision, but it is a defeasible interest—one that may be defeated, *49 but only if the parole panel makes these findings in its review.

We must assess the gravity of the interests at stake in this review—the inmate's interest in liberty and society's interest in safety—in determining what process is due under the federal constitution. The parole panel has great discretion in the regular parole review process as an inmate does not have a statutorily vested liberty interest in being released on parole.[10] Under the Texas Government Code, however, a parole panel has much less discretion in denying an inmate release on mandatory supervision. The statute vests a liberty interest in the eligible inmate, and the statutory presumption is slanted toward release.[11] The parole panel must justify non-release.

The two statutory findings that justify non-release are predictive judgments based upon discrete factual conclusions and subjective appraisals. Necessarily, then, they are highly contingent upon accurate, up-to-date information and explanation. The due process goal in any parole board review is to "minimize the risk of erroneous decisions."[12] Thus, "the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error."[13]

Timely notice to the inmate that he will be reviewed for mandatory release gives him the opportunity to provide written input, marshal evidence of his custodial behavior, clarify adverse material in his file, provide letters, references, and information concerning possible employment or housing. To be effective, this notice must be given sufficiently in advance of the mandatory supervision release review date to allow the inmate to prepare and submit any such information. On the other hand, material submitted too early may be outof-date or superceded by other information or events by the time the review is actually undertaken.[14] Timely notice, which provides sufficient opportunity to submit relevant, up-to-date information by affected parties, is a rudiment of due process, and it reassures both the individual and society that "fair dealing rather than caprice will govern the affairs of men."[15]

In *Greenholtz,* the Supreme Court addressed, *inter alia,* the notice required by the Due Process Clause of the

8/12/2014
Case5:14-cv-01059-BLF   Document35-3   Filed08/14/14   Page24 of 90
Ex parte Retzlaff, 135 SW 3d 45 - Tex Court of Criminal Appeals 2004 - Google Scholar

Fourteenth Amendment in the context of parole hearings, a more discretionary decisionmaking hearing than that under
50    the Texas mandatory supervision statute. In that context, the Supreme Court noted that the Nebraska *50 parole board
provided constitutionally adequate notice because it

> informs the inmate in advance of the month during which the hearing will be held, thereby allowing time
> to secure letters or statements; on the day of the hearing it posts notice of the exact time. There is no
> claim that either the timing of the notice or its substance seriously prejudices the inmate's ability to
> prepare adequately for the hearing.[16]

It therefore reversed the court of appeals' decision which had required the Nebraska parole board to give the inmate
advance notice of the exact time of the hearing, as well as a list of factors that the board would consider. The Supreme
Court found this unnecessary as a component of due process. The Court, in *Greenholtz*, adopted a functional test
concerning the adequacy of notice: the inmate must show not only deficiencies in the notice, but how those deficiencies
adversely affect him.[17] In that case, the Nebraska inmates failed to show that they would be adversely affected in their
ability to submit timely supportive materials because the parole board gave them advance notice only of the month of
their parole hearing, not the exact time and date.

Given an inmate's vested liberty interest set out in the mandatory supervision statute, we conclude that written notice
that an inmate will be reviewed at some unspecified time in the future, coupled with a request that he submit relevant
materials "as soon as possible," is constitutionally deficient notice. It fails to specify any relevant time frame, and it is so
vague that it poses an unacceptable risk of adversely affecting an inmate. With this type of notice, an inmate could be
reviewed the day after the notice was sent and therefore his materials could not be submitted in time, or he could be
reviewed in ten to twelve months, in which case his materials may be entirely out-of-date. This notice is, from a
constitutional due process standpoint, the same as no notice at all.

Following the Supreme Court's reasoning in *Greenholtz*, we hold that, in the normal case,[18] an inmate is entitled to
notice of the specific month and year in which he will be reviewed for release on mandatory supervision. We also hold
that he must be given at least thirty days advance notice that he will be reviewed in the specified month so that he has a
sufficient opportunity to submit materials on his behalf.

Applicant has also alleged harm. He states:

> In the case at hand, applicant was harmed because had he known that his parole hearing was going to
> be conducted on January 16, 2003, he would have used all of the time right up to that date to have letters
> of support submitted by his wife and children and friends; thus, giving the Board the chance to consider
> this relevant and material information prior to its making a decision—this is the very same set of
> circumstances and allegations that were made in the prior Writ application that the Court of Criminal
> Appeals granted!

Although the generic notice that the Board gave applicant in March, 2002, was sufficient to put him on notice that he
would be reviewed some day, our order of August 21, 2002, surely led him to believe that he would receive "timely
notice" before his next review.

51    *51 Given the repeated failures to provide adequate and timely notice to this particular applicant,[19] we conclude that
applicant is entitled to the specific habeas corpus relief that he has requested—a new review "as soon as possible."
Because the mandatory supervision statute requires release unless a parole panel makes specific findings, we find
that Thomas Christopher **Retzlaff's** continued incarceration is illegal and unconstitutional unless, within sixty days, a
parole panel has given him timely notice of a review to be held before the fifty-ninth day and has provided him at least
thirty days to submit whatever explanatory material he wishes the panel to consider. Under our statute, the onus is on a
parole panel to invoke the review process and make its findings, not on the eligible inmate to request a review. Without
a parole panel's two statutory findings, made only after timely due process notice to the inmate giving him an
opportunity to submit materials, the Texas Department of Criminal Justice—CID must release an eligible inmate to

mandatory supervision.

Copies of this opinion will be delivered to the Texas Department of Criminal Justice-CID and to the Texas Board of Pardons and Paroles.

KELLER, P.J., filed a dissenting opinion in which KEASLER, J., joined.

HERVEY, J., filed a dissenting opinion in which KEASLER, J., joined.

KELLER, P.J., dissenting.

The State's motion for rehearing highlights several problems with the Court's original opinion: (1) TDCJ, not the parole board, releases offenders, (2) TDCJ, not the parole board, notifies offenders of their review date, (3) it is not always practical to specify a particular month or date for review because release dates sometimes fluctuate, and (4) thirty days notice is not always practical because some inmates have already approached the release date or will do so in less than thirty days. The Court's revised opinion remedies the first concern, and addresses but does not entirely resolve the third concern. It does not address the second and fourth concerns.

According to the pleadings filed on rehearing, the Board of Pardons and Paroles voted on over 18,000 discretionary mandatory supervision cases during the last fiscal year. The determinations are made by no more than eighteen individuals. And there are thousands of other parole-related decisions made each year by the Board. Inmates are currently given notice about nine months prior to a projected release or review date.[1] The parole board's practice is to conduct a review no sooner than four months prior to the projected release or review date. It appears to me that this procedure meets due process standards under both this Court's caselaw and that of the United States Supreme Court.

52      *52 While the Supreme Court in *Greenholtz* stated that Nebraska satisfied due process by informing the inmate "in advance of the month during which the hearing will be held," it did not say that due process requires the parole board to specify the specific month review takes place or to give at least 30 days notice of the review.[2] The Supreme Court has said that "due process is flexible and calls for such procedural protections as the particular situation demands." [3] "The quantum and quality of process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error."[4] Notifying the prisoner nine months in advance and giving him at least five months time to respond sufficiently minimizes the risk of an erroneous decision. If the inmate has important information to offer, one would expect that he would take less than five months to submit such information. And, given the predictive and subjective nature of any decision regarding an inmate's suitability for release, it is highly unlikely that the basis of the Parole Board's decision would be seriously undermined by information obtained at the last minute.

Moreover, I continue to adhere to my position that, to be entitled to relief on a *Geiken*[5] lack of notice claim, the applicant must show that he has actually been denied a meaningful opportunity to be heard.[6] In this case, the applicant was given advance notice that he would be considered for mandatory supervision, and, if the affidavits attached to the State's motion for rehearing are believed, the applicant was not only afforded the opportunity to submit information in support of release but did in fact submit such information.

The considerations discussed above would be enough for me to urge the Court to reconsider the merits of the application, except that it now appears the applicant has been released to mandatory supervision. According to an April 23, 2004 affidavit of William W. Seigman, a parole panel approved applicant for mandatory supervision on April 21, 2004. So, both mine and the Court's concerns have become moot. It now makes little sense for the Court to fix its original opinion by issuing a revised opinion, when that revised opinion orders the parole board to do something it can no longer do—give advance notice of a mandatory release review when the inmate has already been released. Under the circumstances, we should withdraw our prior opinion and dismiss the application as moot.

HERVEY, J., dissenting.

This dissenting opinion is substituted for the prior dissenting opinion which is withdrawn. The Court has apparently

8/12/2014

Case5:14-cv-01059-BLF   Document35-3   Filed08/14/14   Page26 of 90
Ex parte Retzlaff, 135 SW 3d 45 - Tex Court of Criminal Appeals 2004 - Google Scholar

decided that it will provide the extreme remedy of applicant's early release from prison (even though a parole panel has determined that this would endanger the public) if the parole panel does not meet the Court's extrastatutory and arbitrary deadline for reviewing applicant for mandatory supervision release after "timely notice" to applicant. All of this ignores the ultimate due process question and has the very real potential of putting the security of the public at risk. I

53   must, therefore, respectfully *53 dissent to this particular exercise of the judicial power.

Applicant has filed a habeas corpus application. The record reflects that applicant previously filed another habeas corpus application in which he claimed that a parole panel had not provided him with adequate notice that it would review him for mandatory supervision release. This Court disposed of this writ on August 21, 2002, when it issued an opinion deciding that applicant was denied a meaningful opportunity to be heard when the parole panel reviewed him for mandatory supervision release in November 2001. The parole panel had notified applicant that it would review him in December 2001. *Ex parte Retzlaff,* slip op. at 1-2 (Tex.Cr.App. No. 74,412, delivered August 21, 2002) (unpublished) (by reviewing applicant early, the Board denied applicant a meaningful opportunity to be heard): *see also Ex parte Shook,* 59 S.W.3d 174 (Tex.Cr.App. 2001). This Court's August 21, 2002, opinion ordered the parole panel to "consider Applicant for mandatory release and provide him with timely notice that such consideration will occur." *Id.*

Applicant filed this current habeas corpus application in June 2003. Applicant contends in this proceeding that a parole panel considered him for mandatory supervision in January 2003 without providing him with adequate notice that the parole panel would do so. The record in this habeas corpus proceeding reflects that on March 7, 2002, the parole panel notified applicant in writing that it would again consider applicant for mandatory supervision release at some unspecified future date. This written notice further stated that if applicant wished to submit any additional information, he should do so "in writing as soon as possible to the TDCParole Division, P.O. Box 13401, Capitol, Station, Austin, TX 78711 OR to your Institutional Parole office." The record further reflects that on January 16, 2003, the parole panel denied applicant mandatory supervision release because, among other things, applicant's release would endanger the public and also because applicant committed a major disciplinary offense during the preceding six months. Applicant waited about six months (from January 2003 to June 2003) to file this application for habeas corpus.

Applicant contends that the parole panel did not provide him with adequate notice that it would review him for mandatory supervision release in January 2003. Applicant claims that the "ambiguous, vague" notice that applicant received on March 7, 2002, is the same as no notice at all and that the "[January 2003] hearing was just as defective as the old one [in November 2001] because the Board pulled the same stunt as before!!"

DUE PROCESS

In *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* the Supreme Court decided that Nebraska's "discretionary parole" statutory scheme (which is similar to Texas' mandatory supervision release statutory scheme) afforded all "the process that is due" by providing the inmate with an opportunity to be heard and informing the inmate of why he was denied "discretionary parole." *See Greenholtz v. Inmates of the Nebraska Penal and Correctional*

54   *Complex,* 442 U.S. 1, 99 S.Ct. 2100, 2108, 60 L.Ed.2d 668 (1979).[1] But, *54 this Court decides that the parole panel violated applicant's federal constitutional due process rights because it should have provided applicant with better notice of the time it would review applicant for mandatory supervision release. But the due process issue is not necessarily whether applicant should have received better or perfect notice. The due process issue is whether the notice that applicant did receive provided applicant with an opportunity to be heard before the parole panel denied him mandatory supervision release. *See Greenholtz,* 99 S.Ct. at 2108.

The majority does not expressly hold that applicant was denied this opportunity to be heard. Instead, the Court speculates that the (March 7, 2002) notice that the applicant in this case received could deprive some future hypothetical applicant of an opportunity to be heard.[2] The Court further relies on applicant's allegation of "harm" that had he been given better notice, he "would have used all of the time right up to [January 16, 2003] to have letters of support submitted by his wife and children and friends." But, applicant has not shown that he had any (old or new) materials to submit. And, it is extremely doubtful that any unsubmitted materials that applicant may have had would have helped applicant given the Board's determination that applicant is dangerous to the public—a determination that

8/12/2014

Case5:14-cv-01059-BLF Document35-3 Filed08/14/14 Page27 of 90
Ex parte Retzlaff, 135 SW 3d 45 - Tex Court of Criminal Appeals 2004 - Google Scholar

this applicant does not dispute.[3]

The situation presented in this proceeding is not like the situation described in our August 21, 2002, opinion where a parole panel notified applicant that it would consider him for mandatory supervision release in December 2001 but then considered him in November 2001. See *Retzlaff*, slip op. at 1-2. There, we expressly decided that applicant was denied an opportunity to be heard when the parole panel reviewed him early. See *id.* In this case, the parole panel did not review applicant early. The parole panel reviewed applicant within the time frame that it stated that it would review applicant in the March 7, 2002, notice. This notice also shows that applicant had an opportunity to submit any additional information to the parole panel in support of his claim for mandatory supervision release. This notice even stated that applicant should submit this information "as soon as possible." On this record, applicant has not shown that he was denied an opportunity to be heard.[4]

55    *55 THE REMEDY

The Court, contrary to the "plain" language of the applicable statutory scheme, further decides that "[w]ithout the two statutory findings, made only after timely due process notice to the inmate giving him an opportunity to submit materials, a parole panel must release an eligible inmate to mandatory supervision." This is an extreme, and potentially dangerous to the general public, remedy for any due process violation that may have occurred here. Instead of putting the public at risk with the early release from prison of dangerous inmates because of a parole panel's failure to comply with our orders, the Court should incarcerate the responsible Board officials under its contempt powers until they comply with the Court's orders. This, and not putting dangerous inmates back on the streets before they have served their sentences, is the usual method of enforcing our orders.

I respectfully dissent.

[1] TEX. PEN.CODE § 46.03.

[2] See *Ex parte Shook*, 59 S.W.3d 174 (Tex. Crim.App.2001). In that case, we explained that:

when the Board gives the inmate notice of a *specific date* on which the hearing is scheduled to take place, the inmate is entitled to rely on that information and accordingly has until that date to submit relevant information on his behalf. If the Board holds the hearing for such consideration on a date earlier than the specific date the inmate has been notified that the hearing will take place, then the inmate has been misled by the notice and denied the full opportunity he was told he would have in order to submit relevant information to the Board.

*Id.* at 176.

[3] Specifically, we ordered the Board to "consider Applicant for mandatory release and provide him with timely notice that such consideration will occur." *Ex parte Retzlaff*, No. 74,412, slip op. at 2 (Tex.Crim.App.2002) (not designated for publication). We do not have any record that the Board provided applicant with an additional review and timely notice of that review based upon our order.

[4] This notice is a standardized form which states, in pertinent part: "Before your projected release date, the Board will review your file and all available records to determine if you will be released." This document does not inform the inmate of his projected release date.

[5] See former TEX.CODE CRIM. PROC. art. 42.18, § 8(c).

[6] H.B. 1433 Comm. Report (Amended), 74th Leg. (April 11, 1995).

[7] TEX. GOV'T CODE §§ 508.147 & 508.149.

[8] See H.B. 1433 Comm. Report (Amended), 74th Leg. (April 11, 1995) ("[t]he purpose of this Act is to give the Pardons and Parole Board a lever to close the 'automatic open door' of mandatory supervision.... This legislation allows for discretionary release by the Pardons and Parole Board for all inmates, while still providing for the original intent of the legislation, supervised release, in most instances").

[9] TEX. GOV'T CODE § 508.149(b).

[10] See *Ex parte Geiken*, 28 S.W.3d 553, 558 (Tex.Crim.App.2000) (noting that while the parole system in Texas creates no

presumption of release on parole, the mandatory supervision statute does).

[11] *Id.* ("[u]nlike parole, which requires that the Board vote in favor of release, the mandatory supervision statute requires that the offender be released absent Board action to the contrary").

[12] *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 13, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)* (discussing what process is constitutionally due for state parole board hearings).

[13] *Id.*

[14] See *Geiken, 28 S.W.3d at 560* (noting that "[t]he option of providing the Board with information supportive of release is of little practical use if the inmate is unaware that such a review will be taking place"); see also *Ex parte Shook, 59 S.W.3d 174, 175 (Tex. Crim.App.2001)* (reiterating prior holding that constitutional due process requires Board to give inmates timely advance notice of their review for release on mandatory supervision).

[15] *Morrissey v. Brewer, 408 U.S. 471, 499, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (Douglas, J., dissenting).*

[16] *Greenholtz, 442 U.S. at 14 n. 6, 99 S.Ct. 2100.*

[17] *Id.*

[18] We recognize that there may be logistical peculiarities in a particular case—or small class of cases—that could make designation of a specific month for review impractical.

[19] Section 508.149(d) of the Texas Government Code provides that a parole panel determination not to release an inmate on mandatory supervision is immune from administrative or judicial review, but it does provide the inmate with two further opportunities for re-review within the following two years. TEX. GOV'T CODE § 508.149(d). The wording of this provision indicates that, after three unsuccessful annual reviews, an inmate need not be reviewed again for release on mandatory supervision. This applicant's first two reviews were made without sufficient due process notice. For this, his last review, he is entitled to a "speedy and effectual" habeas remedy.

[1] The Board of Pardons and Paroles is not a party to this case. Neither is TDCJ. Their first opportunity to provide relevant information was, thus, on rehearing by way of an amicus brief. Much of the information in the pleadings on rehearing is, for this reason, presented to the Court for the first time.

[2] *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex, 442 U.S. 1, 14 n. 6, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).*

[3] *Id.* at 12, 99 S.Ct. 2100.

[4] *Id.* at 13, 99 S.Ct. 2100.

[5] *Ex parte Geiken, 28 S.W.3d 553 (Tex.Crim. App.2000).*

[6] *Ex parte Shook, 59 S.W.3d 174, 176-177 (Tex.Crim.App.2001).*

[1] I generally agree with the Court's description of Texas' mandatory supervision release statutory scheme. In this case, the habeas record reflects that the parole panel made the necessary findings that makes applicant ineligible for mandatory supervision release. In addition, it would appear that Texas inmates have less of a "liberty" interest under the current statutory scheme than they did under the prior scheme since the prior scheme provided for "automatic" release and the current scheme does not. See *Greenholtz, 99 S.Ct. at 2106-07* (describing how Nebraska's "discretionary parole" statutory scheme created a due process protected liberty interest in the expectation of parole).

[2] For example, on page eight of its opinion, the Court states:

With this type of notice, an inmate could be reviewed the day after the notice was sent and therefore his materials could not be submitted in time, or he could be reviewed in ten to twelve months, in which case his materials may be entirely out-of-date. This notice is, from a constitutional due process standpoint, the same as no notice at all.

[3] In deciding that "an inmate is entitled to notice of the specific month and year in which he will be reviewed for release on mandatory supervision," the Court's opinion reads too much into footnote six of *Greenholtz.* There, the Supreme Court noted that there was no claim that notifying an inmate of the month in which he would be reviewed for "discretionary parole" violated due process. See *Greenholtz, 99 S.Ct. at 2107 n. 6.* The Supreme Court did not hold that due process required this. See *id.*

[4] Notwithstanding this, it is worth mentioning the overall context in which cases like this come before the Court. The State of Texas may without violating the Constitution require inmates like applicant to serve their entire sentences day for day with no hope of parole or any other form of early release. Nevertheless, Texas citizens through their Legislature have provided for inmates like applicant to be reviewed for early release atleast once a year. The statutory scheme even requires these inmates' release unless the Board makes the necessary findings that would prevent this. Though the applicable statutory scheme does not require it, a parole panel also provides these inmates with an opportunity to submit materials each time they are reviewed for early release. In this case applicant received everything that he was entitled to receive under state law when the parole panel denied him early release based on the findings required by the statutory scheme. Arguably, this is all "the process that is due" applicant. See *Jimenez v. State,* 32 S.W.3d 233, 244-45 (Tex.Cr.App.2000) (McCormick, P.J., concurring) (due process requires that a defendant receive what state law provides).

Save trees - read court opinions online on Google Scholar.

EXHIBIT 18

wtf *said:*

it would be sooo much fun to kill all of mc-stupids kids, one by one while he watches me go over them with a blowtorch.

**REPLY**

wtf *said:*

May 15 2014 at 1:30 pm

Fuck off. You will pay a price for your shit. I will kill your kids, slowly. I will enjoy watching them bleed out. Extinguishing your half-breeds will be a highlight of anyone's day. Now gfy.

**REPLY**

whatfuckingevver *said:*

May 15 2014 at 1:44 pm

I hope McGibneys sons are all hung from a tree and murdered. All half-breeds need to be killed.

**REPLY**

Posted By: LongJohnSilver | 11/02/13 9:01 PM

I am simply amazed that this Bullyville guy, James McGibney, is still alive. If I was listed on his website I would put a bullet in his head. It's as simple as that. His home address has been posted online. And he makes scheduled public appearances. One of these days James is going to post the name of the wrong guy and it will cost him - and his family - their lives. Some people do not care about consequences or police or being arrested James has enough enemies that it would be easy for a shooter to get away. The cops wouldn't know where to start looking. You walk up behind him at a Wal-mart or whatnot, you shot him and take off, dump the gun in Lake Mead or somewhere and you're go to go. So go ahead James, keep it up. Sooner or later you're going to step on the wrong set of toes and you're going to come across a real life tough guy, not an internet tough guy like a Hunter Moore, and it's gonna cost you and your family.

Login to reply

Posted By: Cowardly | 11/02/13 9:50 PM

Holy premeditated murder plan. What a dumb comment to make on a site that is monitored by the FBI for stupidity just like this. They'll find out who you are. they always find out.

Login to reply

Posted By: LongJohnSilver | 11/02/13 10:12 PM

No they don't. Did you know that over 40% of all murders each year go unsolved in the U.S.? Since I use TOR and a random person's open WiFi, I can't be tracked you nitwit. You don't think that this has been thought through? Besides, you need to remember something very, very important: CRAZY PEOPLE DO NOT CARE IF THEY GET CAUGHT. THEY WILL KILL YOU REGARDLESS AS TO THE CONSEQUENCES TO THEM BECAUSE THEY ARE CRAZY. So while it's all well and good that the FBI will eventually catch them (assuming they're not one of the 40% who literally do get away with murder), it does you little good if you're the dead guy or the dead family.

Login to reply



In reply to @BullyVille



**captain obvious pedo**
@PedoCaptain



@BullyVille I would like to bury a hatchet right in your fucking damn face. Public info: 10620 southern highlands pkwy - vegas ANYONE?????

12/17/13, 6:26 PM

  

Reply to captain obvious pedo


Home


Connect


Discover


Me



Your Aryan Brother said:

June 8, 2014 at 10:53 pm

Self-professed anti-bullying "advocate" and all around piece of human garbage is giving everyone the heads up that, because he is unable to control his own behavior, he will soon be banned (yet again) from Twitter.



**BullyVille**
@JamesMcGibney

🔵 Follow

Please RT: There's no doubt this account will be permanently suspended soon enough, so make sure you follow @PotatoVille.

9:36 PM - 8 Jun 2014

24 RETWEETS 5 FAVORITES

⬅ 🔁 ⭐

I hope we see the end of this clown soon. His name & address, and pics of his wife & kids, have been prominently posted in the PRIVATE forums of Storm Front and VNN and other WP sites for a couple months now. I wish someone would start handling their business ASAP,



REPLY

Submitted on 2014/07/11 at 6:47 PM

So the reason why McGibney is pissing away thousands of dollars of his ViaView investors' money is because he doesn't like what this guy says on Twitter? So is that how things work now? We don't like what someone says on Twitter so McGibney becomes a self-appointed vigilance out to clean up all the trolls on the internet?

Funny but I seriously doubt Thomas gives two shits about McGibney or his studio LOLsuits. I also seriously doubt he gives two shits about what people say about him, either. Like a guy who is allegedly a member of a murderous prison gang cares what twitter nerds have to say.

By the way, did you know that the post about McGibney on the PRIVATE forum on the Storm Front website has had 50,000 views in the last few weeks? All the pics of McStupid's family, cars, home address, work info, all that good stuff, et oh el

# EXHIBIT 19

Jay Leiderman

From:         Important ⬛⬛⬛⬛⬛⬛⬛⬛⬛
Sent:         Tuesday, May 13, 2014 4:51 PM
To:           James McGibney
Cc:           Jay Leiderman
Subject:      Another email...


Sent from my iPad

Begin forwarded message:

> **From:** Tom Retzlaff <retzlaff@texas.net>
> Date: May 13, 2014 at 5:20:12 PM GMT-5
> To: Brittany Retzlaff <⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛>

I was told that this guy has you listed in court papers as an employee for his company. And you realize that these court papers are all public records and have, by now, likely been posted all over the Internet. So everyone can see that Brittany Retzlaff works for ViaView Revenge Porn and Blackmail company.

Do you have any idea of just how many people hate that man, his website, and company? Tens of thousands of people, kid. And now ALL of those people see your name as being associated and working for this company.

This man is posting emails with your personal information, your email address, and your private info. He is a member of the hacking group Anonymous. How soon do you think till your SSN and other info start appearing on hacker and identity thieves websites? Probably there by the end of the day.

And now 10,000 plus people will hate you for working for him and you will be there forever associated with this.

You know both mom and brother will be in court with me, and your grandfather. Will that make you feel good? Because you know I will fight this and we will fight this using everything we can.

This man runs a disgusting business and now he attacks me and your family. He'll tell you he isn't interested in them, but it's a lie. Why else is your mother's and brother's and family's information all over his website and twitter?

Oh but he's your friend and a good person.


Dad


Tom Retzlaff

1

Jay Leiderman

From:
Sent:           Thursday, May 15, 2014 10:51 AM
To:             James McGibney; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Subject:        Fwd:


---------- Forwarded message ----------
From: **Tom Retzlaff** <<u>retzlaff@texas.net</u>>
Date: Thursday, May 15, 2014
Subject:
To: Brittany Retzlaff <▓▓▓▓▓▓▓▓▓▓▓▓▓>


Listen, I know this religious stuff is very important to you, but I have a lot of difficulty understand that kind of stuff and why it appeals to you. That still does not mean that I can't appreciate the fact that this is something important to you. I don't like it or agree with it – **but most importantly that doesn't matter.** What matters is what you get out of it and how it makes you feel.


I respect that.


I respect that part of your life about you. And don't think for an instant that I love you any less for you. Because I do not. While at first I was very, very angry and did not want to have anything to do with you, with my age has come some wisdom and a greatly increase in knowledge on this matter.


With regards to the upcoming conflict, you need to understand that those people out you in the middle of this for a reason, and it wasn't for my reason and it wasn't for your reasons. They have their own agendas which have nothing to do with ours. But irrespective of that, I will have to do whatever it is that I have to do to get at and destroy these people in the same fashion that I have done so before, and if you get caught in the middle or in the cross fire, so be it. I will not slow down or lesson my attacks one bit because of your presence.


After all, you were the one who decided to sign up for this little fight. And if I end have having to go through you to get at them, I will do so. I will be very sad afterwards. But I get sad about a lot of things anyways, so what's one more sad thing, eh?


This McGibney & Leiderman guys don't know who they are messing with. I wrestled and stole away hundreds of thousands of dollars from multinational corporations in lawsuits that they did not want to give me. But in the end I prevailed. I fought for an won my freedom from prison (and the freedom of thousands upon thousands of

men) when it was me alone vs. the entire state of Texas.  You read all the letters that I got from all the inmates I helped afterwards and the newspaper reports.  4,500 people let out on account of me.  Who knows how many by now ten years later.

Just so you know that I will fight, that I fight hard, and that I end up winning more often than not.  And when I do lose, I make damn certain that the other guy wished he hadn't got into the fight to begin with.  That's the secret to losing: making the other guy's "victory" taste like burnt ashes in his mouth with his litigation budget all blown to hell, his bosses all pissed off over all the delays and hearings and clients being forced to write check after check in order to stay in the fight.  And in the end left then with nothing but a scrap of paper with a judgment on it not worth the paper it is written on.

So I will fight him, and I will fight you.  In the end when you end up destroyed, who will be left to care about you then, Brittany?  But this is what you get when you associate with the kind of man who runs a revenge porn company and who makes his money in ways we both know Jehovah would not approve up.  And once your elders find out about this, you're dead meat.

Dad

2

Jay Leiderman
_____

From:
Sent:              Thursday, May 15, 2014 10:53 AM
To:                James McGibney
Subject:           Fwd:
Attachments:       Capture.JPG


---------- Forwarded message ----------
From: Tom Retzlaff <retzlaff@texas.net>
Date: Thursday, May 15, 2014
Subject:
To: Brittany Retzlaff <

Dearest child Brittany,


You understand, don't you, that there is not a thing that this man or lawyer can do that will help you. You already know by now that I do not care about court orders or restraining order or cops or any of that stuff. And you know that your brother and mother will be right there supporting me no matter what.


As I have told you many times throughout the years: I may be a son of a bitch, but I am your son of a bitch. Or have you forgotten what I did to Robert for you? Weren't you the one, after all, who showed me where his mother lived and where he was staying? Who was it that made sure you got ALL of your stuff back and you didn't care how I did it? You forget what it was that you took out of my car that time at the hotel garage? Or remember when you woke me up at 2 am cuz that spic wasn't home and you wanted me to come with you to go looking for him, with my fucking gun because you knew I would shoot him if we found him somewhere he wasn't supposed to be?


And who, exactly, did you call first when you totaled out your car because you thought it would be a good idea to text & drive in the interstate in rush hour and who wanted me to give $20,000 to? Wasn't that a car that I just spent nearly $1,800 fixing for you?


Oh, and who was it that got you accepted into the university and PAID entirely your first full year of tuition, books & fees?


And who is it that is still trying to pay off YOUR debts and credit card bills even now?

1

Listen, I am not complaining. You know that I would do (and have done!!!) all kinds of terrible things to those you want without hesitation or remorse. Just like we both know that there will come a time when you will need my help with Daniel. I'm not throwing this in your face or giving you a hard time. I don't mind doing these things for you because it comes with the job. I may at times be a shitty father and I may not always (or even usually) do the right things, but I always try to do what I think is best for you however misguided or plain wrong that might be, but it's with good intentions, right? So don't that count some?. But at the end of the day, I am <u>your</u> father Brittany. And nothing will ever change that.

I will always do what I think is best for you and I will never stop doing that until the day that I die.

This guy is a real idiot and a clown. <u>Like he thinks I give a shit about his stupid lawsuits or court orders.</u> Seven years in prison I spent. You think anything he does is going to change me or affect me? <u>Some stupid court way out in California 1,500 miles away is not going to affect me one bit.</u> Certainly it is an aggravation and it pisses me off. But then so do a lot of things.

This photo attached here that this attorney posted on Twitter is my Get Out of Jail Free card, and it's a Golden Ticket to an easy lawsuit win for me against this attorney here where I live – not in California. Either the statement he said is true or it is not true. As you know, it is not true. Thus, I win. It's only a question as to how much it will cost him.

If you are looking at these people to save you, look the other way, because they can't. They are not even in a position to save themselves. And now that media attention is being brought to this case, things are only going to get worse. Your name and employment with this revenge porn company is going to draw you a GREAT DEAL of unwanted attention and harassment. I would not be surprised if you haven't been contacted already. While you may think that just because you are in Peru that you are immune from all of this, think again. You don't think that people in Peru use Google or have email? And what happens if people start contacting your Kingdom Hall and telling them about your working with this man? You cannot deny it because the court records are what they are. There are even people in Peru who have been harassed and posted on this man's Cheaterville.com website and it has received media attention there.

And then what happens when you come home? While you can hide your head in the sand, the world is still out there and people will still remember and know who you are and what you have done. Don't you realize that? These groups of internet terrorists have been fighting each other for years. One group vs another group. They think it is funny to call up employers and family members of the other group's members and harass and stalk them. <u>BOTH SIDES ARE LIKE THAT.</u>

You have put your name on the radar of some very irrational and dangerous people.

2

This is the kind of man who runs a REVENGE PORN WEBSITE. And from what I have read about him, he is under investigation by the state of California and other authorities. He is not a white knight coming to save you. He is just using you to get to me. Why else do you think they even got in contact with you, dummy?

But whatever. You learn the hard way, just as you always do. But understand this, kid:  No fucking restraining order is going to stop me doing what I need to do with my children or from being with you.  Prison certainly couldn't change me, this clown hasn't a chance. It will all end in one huge bloody mess and you won't be happy in the end. And how will this hurt your mother and brother, as they will be right there with me when it happens? Then you're going to be like "Oh, but I never meant for this to happen." Too bad.

I have warned you before many times:  you are not allowed to come home until you and I have settled our disagreement one way or the other. If you chose to ignore me, you know exactly what is going to happen. And when it happens, words on a piece of paper or restraining orders won't save you. And your brother will be right there with me because I will make him be there, and you know that he will do it.

In the end it doesn't matter. I am a son of a bitch, but I am your son of a bitch. You use me, or the threat of me, to make your enemies submit to you just like with Robert and the others. But that's my job.

I loved you even before you were born, and I will love you till my last breath. I am YOUR father, weenie. I miss you even much and I love you even more.

Mices to pieces, right?

Daddy

Jay Leiderman
@JayLeidermanLaw

Follow

Those emails to the Texas ViaView make it clear she knows Retzlaff, convicted sex offender. Retzlaff makes routine death threats to McGibney

Reply ↺ Retweet ★ Favorite ••• More

RETWEETS 3

FAVORITE 1

1:32 PM - 24 Apr 2014

Jay Leiderman

From:
Sent:         Thursday, May 15, 2014 10:49 AM
To:           James McGibney
Cc:
Subject:      Fwd:

---------- Forwarded message ----------
From: **Tom Retzlaff** <retzlaff@texas.net>
Date: Thursday, May 15, 2014
Subject:
To: Brittany Retzlaff <

If u wish to get out of this mess, you have to let me know and I will draw up the proper papers for you to. I will say do not trust them to do it. But you won't listen.

But I will destroy you in this fight against them. They don't care about you. You are just a tool to them to get at your father. But little do they know just how much I don't care. But this is what you signed up for when you decided to get involved.

I will spend every last penny I have. Not only that, I will spend every last penny your mother has, too. And you know she'll give it all to me. Same with brother.

So you decide. You can hide and non-action is not an option since Ur name is on that paper. So u will be gotten to no matter where Ur at.


Tom Retzlaff

1

Jay Leiderman

From:           Important ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
Sent:           Tuesday, May 27, 2014 6:06 AM
To:             James McGibney; Jay Leiderman; ⬛⬛⬛⬛⬛⬛⬛⬛
Subject:        Another Tom email


Sent from my iPad

Begin forwarded message:

> From: "Tom Retzlaff" <retzlaff@texas.net>
> Date: May 26, 2014 at 11:37:59 PM GMT-5
> To: "Brittany Retzlaff" <⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛>
> Subject: lawsuit update

By the way, your "friend" suffered a terrible defeat in Texas last Wednesday. He filed a lawsuit against me and about 5 other people. Someone who has a rich father paid for a lawyer on behalf of one of the defendants to file a response and to seek sanctions for violating our rights to free speech. Your friend tried to immediately dismiss the lawsuit and make it go away, but the judge wouldn't let him. The man with the rich father has paid out nearly $65,000 for this lawyer in Houston. He is one of the top First Amendment lawyers in Texas and is very well known in the newspaper industry. So my guess is that someone with ties to the newspaper industry either knew this lawyer or heard about him and then got him the money needed to fight. Since I know how you like to talk to this fool in California I won't mention anything further. But it is funny as hell. Anyways the judge will make his ruling on June 11th and I will be there to laugh my ass off and collect some money.

Sanctions are likely to be $100,000 or more as the law is very clear and the lawsuit he filed against me was very bullshit. Once we get done in Texas the next stop will be California and I am going to pound this little faggot like a drum and take everything he owns. I have already lined up a guy named Karl Olson, he is THE TOP first amendment lawyer in California and, again, another friend of the newspaper industry.

This man was an idiot for fucking with me. I took on the state of Texas all by myself from my prison cell and won my release – and the release of many thousands of others. I have filed and won countless other lawsuits against some of the biggest companies in the US. AS YOU WELL KNOW. So do you honestly think that some revenge porn website owner and his one jew lawyer can beat me when the whole of the Texas Attorney General's Office and Parole Board tried to keep me in prison?

1

Jay Leiderman

| | |
|---|---|
| From: | Important |
| Sent: | Tuesday, May 27, 2014 6:05 AM |
| To: | James McGibney; Jay Leiderman; |
| Subject: | Tom email |

Sent from my iPad

Begin forwarded message:

> From: Tom Retzlaff <retzlaff@texas.net>
> Date: May 27, 2014 at 6:49:12 AM GMT-5
> To: Brittany Retzlaff <
> Subject: Mom's pic

A picture speaks a thousand words, and mom told me that you saw the photo I sent you of her and I in bed. Why would something like that surprise you? She and I have been together for nearly 40 years we've known each other. What she says to you, and to others, is far different than how she is with me, as you know.

As things stand right now you will not be allowed back home or anywhere near the house. I will bring enormous amounts of pressure on your mother and do whatever I need to do to get her to see things my way. I mean this Brittany.

I will do whatever it takes to keep you and that boy away.

The man who claimed to be your friend and savior I just found out right this very minute has suffered an enormous defeat. The judge in Texas is likely to order sanctions in the amount of $250,000, plus $67,000 in attorney fees for filing that bullshit lawsuit against me and some other people.

Right now his websites have been shut down. All of his advertisers have been run off, his twitter account banned and removed - and he blames it all on little old me, your daddy. Lol

Guess he shouldn't have posted your pictures on his website and tried to charge me $200 to remove him.

But now it appears that you have betrayed me, but you have also betrayed the family as well. That I cannot tolerate. So for your own good, under no circumstances are you to return to the US. It will be hell for you if you do.

That hacker bunch I told you about? When you decided to work with that revenge porn man you name and personal information got into the hands of some seriously fucked up people who will stalk you and harass the fuck out of you and any place you try to work at because you joined their enemy.

I already found your SSN and pictures on hacker website along with Leigh Ann and Eddie. These hacker types are ridiculous and evil and don't care.

1

When you joined that man and his company you became enemies of a huge number of people.

If you do not want to talk to me and work things out, do not set foot in the US. No piece of paper will be able to help you. But you always have the choice of calling.

Dad


Tom Retzlaff

**James**

**From:** Important <​                              >
**Sent:** Tuesday, April 22, 2014 11:21 AM
**To:** James
**Subject:** Fwd: Tom email 2

Sent from my iPad

Begin forwarded message:

> **From:** "Tom Retzlaff" <retzlaff@texas.net>
> **Date:** April 22, 2014 at 1:18:49 AM GMT-5
>
> Even that asshole's lies don't make any sense. If I got kicked out of school, then how is it that I have a degree form that school hanging upon my wall, which you have seen?
>
> And his claim that I go fired from my job 'cause of some problem with a secretary? Then why did I get a fine letter of recommendation that lead me to having a similar job out here?
>
> In any event, I sit here contemplating the murder of this man and his family. In the end he knows not whom he is messing with. Going to jail (assuming I get caught) ain't nothing but a thing to me.

1

**From:**
**To:** James McGibney
**Subject:** Tom email
**Date:** Monday, June 09, 2014 10:00:10 PM

Sent from my iPad

Begin forwarded message:

> **From:** Tom Retzlaff <retzlaff@texas.net>
> **Date:** June 5, 2014 at 4:38:31 AM GMT-5
> **To:** Brittany Retzlaff <
>
> Right now your brother is right next to me while we make our plans on how best
> to deal with you. I can send you a pic if u want, like the one I sent of me and mom
> in bed a couple weeks ago. Your mom and I have been together since we were
> about 10 years old. We are from the same towns. She a cheerleader and I the
> hockey, football, baseball player during high-school. You remember see all those
> trophies in my old room at my mom & dad's, rights?
>
> When Ur brother was sick and needed help last fall, who sat with him day and
> night, even when he didn't want it and even when he felt fine. Yeah, me. You
> think he ain't going to remember that when the time comes?
>
> Or what I did to save Ur mom's house from being foreclosed. Or helping he keep
> her lights on and making sure collin's place is all ready for him.
>
> Bad enough I got my own life and own problems, but I gotta deal with hers, and
> his, and yours. But whatever. That's my job. Imma the dad.
>
> You need to understand that I know exactly what to do and say to get the truth
> out of u. I also know what buttons to press that will leave u feeling cold, lifeless,
> and suicidal and deepy in paid. Afterall, I created you. I taught u everything you
> know.



> Remember the movie Old Yeller? You remember how it ended and why? In the

end I will do to u what needs to be done and that will be that.

Dad

Don't shoot!! I have a TRO! *said*:

July 26, 2014 at 8:03 pm

How about this?

An asshole who thrives on publicity because he's a fame-fagging faggot picks his targets (Duffy, Neal, Kate critics, Retzlaff), pretend they are the devil incarnate and claims he's going to ruin them. Attack them non-stop for months. Call Radar Online and spin a stupid conspiracy theory cuz you're a lying bitch. File two lawsuits and a TRO against these people and pretend they attacked you. Subpoena a bunch of people who never heard of the person named in the TRO.

Now here's the ending. You ready?

Get the FUCK SLAPPED out of you, deservedly so, then cry like a baby. WAAHHHH!! WAAHHHH!!!

We're tired of you. Go away and do your talking in court. In other words, NOBODY CARES ASSHOLE!!

Hey, I have a question. Since this TRO is already taking months and months, is McStupid OK? I mean, he doesn't have that meaningless piece of paper protecting him from a man who doesn't give to shits about him. How is it that he's still ok???

And no, I'm not mad, BRO. Just fucking disgusted that people in San Jose who really need a TRO aren't getting one because dumb shit fuck-head McStupid is clogging up the courts with this nonsense. He's nothing but a leech, just what CA needs, another user and taker bleeding it dry.

# EXHIBIT 20

8/12/2014

Case5:14-cv-01059-BLF   Document35-3   Filed08/14/14   Page53 of 90
In re Retzlaff, 345 SW 3d 777 - Tex. Court of Appeals, 8th Dist. 2011 - Google Scholar

345 S.W.3d 777 (2011)

## In the Matter of the Expunction of Thomas Christopher RETZLAFF.

No. 08-10-00223-CV.

Court of Appeals of Texas, El Paso.

July 27, 2011.

778   *778 T.C.R., San Antonio, TX, pro se.

J. Frank Davis, Courtney Hunt Moore, Texas Department of Public Safety, Expunction Attorney, Crime Records Service, Austin, TX, Sheri Bryce Dye, Assistant District Attorney, Bexar County District Attorney-Civil, San Antonio, TX, for Appellees.

Before CHEW, C.J., McCLURE, and RIVERA, JJ.

# OPINION

DAVID WELLINGTON CHEW, Chief Justice.

Thomas Christopher Retzlaff appeals the trial court's order denying his petition for expunction of several misdemeanor harassment charges. In two issues, he challenges the trial court's ruling on his petition, and contends the court abused its discretion by denying his motion for continuance.

Appellant was arrested in San Antonio for six counts of misdemeanor harassment between August and December 2008. Criminal charges were filed in Neuces County Court at Law Number Four. The charges were dismissed by a court order filed on January 28, 2010, because the complaining witness could not be located.

Appellant filed his petition for expunction of the harassment charges on February 9, 2010. The State opposed the motion, arguing that Appellant could not meet his burden to prove his right to expunction under Texas Code of Criminal Procedure Article 55.01(a), because the statute of limitations for the charged offenses had not expired prior to the date on which Appellant filed his petition for expunction. See TEX.CODE CRIM. PROC. ANN. 55.01(a)(2)(A)(i)(West Supp.2010).

The district court heard evidence and argument regarding the petition on March 25, 2010. Appellant argued that the harassment charges had been dismissed "with prejudice" in the Neuces County Court at Law, which he asserted was equivalent to having been found not guilty of the offenses. He concluded, therefore, that the limitations period was not a bar to his petition. In support of his argument, he represented to the trial court that he had subpoenaed the judge of the

779   County Court at Law to testify to the fact that the charges had, in fact, been dismissed with *779 prejudice. Appellant also moved for a continuance of the expunction hearing on the basis that this witness failed to appear to testify. The trial court denied Appellant's motion.

The State produced a certified copy of the State's motion to dismiss the harassment charges, as well as a certified copy of an order dismissing those charges. The documentation did not indicate that the charges were dismissed, "with prejudice" as Appellant argued. The trial court denied Appellant's petition in open court at the end of the hearing, and entered a written order to that effect on the same day.

Following the denial of his motion for new trial, and entry of findings of fact and conclusions of law, Appellant timely perfected his appeal to this Court. He raises two issues for our review. In Issue One, he contends the trial court erred by denying his petition for expunction because he established that he had, "fulfilled all of the statutory requirements necessary to be entitled to an expunction." In Issue Two, Appellant argued that the trial court abused its discretion by

denying his motion for continuance.

We will begin our analysis with Issue Two. The decision to grant or deny a motion for continuance is within the trial court's sound discretion. _Wilborn v. GE Marquette Med. Sys., Inc._, 163 S.W.3d 264, 267 (Tex.App.-El Paso 2005, pet. denied). A court's ruling will not be disturbed absent a clear showing in the record that the court's clearly abused that discretion. _Wilborn_, 163 S.W.3d at 267. Even in the case of a legal error by the trial court, the case cannot be reversed unless this Court concludes that error complained of probably caused the rendition of an improper judgment, or prevented the appellant from presenting his case on appeal. TEX.R.APP. P. 44.1(a).

Appellant's argument is based on the presumption that if he had appeared and testified at the expunction hearing, the judge of the county court at law would have testified that Appellant's harassment charges were dismissed with prejudice. Such testimony would have been in complete contradiction to the documentary evidence presented by the State in the district court. The district court noted on the record both the certified copies of the State's motion to dismiss the charges based on their inability to locate the complaining witness, and a certified copy of the judgment of dismissal, dated January 28, 2010, which contains no indication that the charges were dismissed with prejudice. In essence, Appellant's argument is an attempt to collaterally attack the dismissal judgment, and by doing so, alter the judgment's effect.

A collateral attack is an attempt to avoid the effect of a judgment in a proceeding brought for some other purpose. _Adams v. State_, 222 S.W.3d 37, 57 (Tex.App.-Austin 2005, pet. ref'd). In addition to circumstances not at issue here, collateral attacks in the criminal context are generally limited to cases where the judgment is void. See _Nix v. State_, 65 S.W.3d 664, 668-69 (Tex.Crim.App.2001). In this case, Appellant makes no argument that the dismissal judgment was void. In fact, his argument indicates that he believes the judgment should be afforded more authority than is apparent on its face, or is apparent from the context in which it was rendered. Under these circumstances, the trial court did not abuse its discretion by denying Appellant's request for a continuance. Issue Two is overruled.

In Issue One, Appellant argues the trial court erred by denying his petition because he established his right to have the
780    *780 harassment charges expunged. The State responds to Appellant's argument by arguing that there is no evidence that the Statute of limitations has expired on Appellant's harassment charges. In essence, Appellant raises a "matter of law," legal sufficiency challenge against the trial court's finding that the limitations period had not expired on the date he filed his petition. See _In re E.R.W._, 281 S.W.3d 572, 574 (Tex.App.-El Paso 2008, pet. denied); _In re J.A._, 186 S.W.3d 592, 595 (Tex.App.-El Paso 2006, no pet.).

A challenge to the trial court's fact findings will be reviewed under the same standard applicable to a review of the evidence supporting a jury's answer. _In re J.A._, 186 S.W.3d at 594. In a legal sufficiency review, we consider only the evidence and inferences that, when viewed in a light most favorable to a verdict, tend to support the finding. See _id_. By the same token, evidence and inferences that are contrary to the judgment will be disregarded. _Id_.

The right to an expunction is a statutory privilege. _Id_. Article 55.01 of the Texas Code of Criminal Procedure provides the statutory requirements for both felony and misdemeanor expunction. See TEX.CODE CRIM.PROC.ANN. art. 55.01(a). As with any statutory cause of action, all provisions are mandatory and exclusive. _In re J.A._, 186 S.W.3d at 595-96. A person is only entitled to an Article 55.01 expunction when all of the statutory conditions have been met. _In re J.A._, 186 S.W.3d at 595-96. The burden to establish compliance with the statute rests with the petitioner. _Id_. at 596.

In relevant part, Article 55.01 states that a person charged with a felony or misdemeanor is entitled to an expunction only if:

(2) each of the following conditions exist:

(A)[I]f an indictment or information charging the person with commission of a felony was presented, the indictment or information has been dismissed or quashed, and:

(i) the limitations period expired before the date on which a petition for expunction was filed under Article 55.02;

TEX.CODE CRIM.PROC.ANN. art. 55.01(a)(2)(A)(i). The limitations expiration requirement, the only statutory condition at issue on this case, applies to both felony and misdemeanor offenses. *State v. Beam*, 226 S.W.3d 392, 395 (Tex.2007). Therefore, to be entitled to an expunction Appellant's burden included establishing that the limitations period expired prior to February 9, 2010, the date he filed his petition for expunction. *See Beam*, 226 S.W.3d at 395. The limitations period for a misdemeanor offense is two years from the date of the commission of the offense. *See* TEX.CODE CRIM.PROC.ANN. art. 12.02 (West Supp.2010). In calculating the limitations period, the time during the pendency of a charging instrument is not included. *See* TEX.CODE CRIM.PROC.ANN. art. 12.05(b)(West 2010).

The record in this case indicates that the harassment offenses took place between August and December of 2008, although the date of Appellant's arrest and the date of the charging instrument are unclear. Regardless of the applicable tolling provision however, there is no evidence, nor any reasonable inferences that can be drawn from the evidence, that would support a conclusion that the limitations period had expired on February 9, 2010. As such, the evidence is legally sufficient to support the trial court's finding. Appellant failed to satisfy his burden of proof, and did not

781    demonstrate his entitlement to an expunction. *See* TEX.CODE *781 CRIM.PROC.ANN. art. 55.01(a)(2)(A)(i). Issue One is overruled.

We affirm the trial court's judgment.

Save trees - read court opinions online on Google Scholar.

# EXHIBIT 21

Jay Leiderman
Attorney at Law
5740 Ralston St., Ste. 300
Ventura, CA 93003

July 18, 2014

Re: ViaView v Retzlaff, TRO case
    Case No. 1-14-CH-005460          VIA FAX# 805-654-0280

Dear Sir,

    I am requesting a continuance in this matter from July 29, 2014. As you know, I had abdominal surgery this past Monday afternoon, July 14, 2014. The summons in this case was only "served" on me Monday night.

    Attached is a statement from my doctor attesting to the fact that I had surgery and that I am unable to travel until at least October 14, 2014.

    This is an attempt to confer with you prior to my filing a motion for continuance. Will you agree to a continuance?

    Be advised that I shall shortly be filing a special appearance / motion to quash summons for lack of jurisdiction over a nonresident defendant, as well as an anti-SLAPP special motion to strike, as well as a challenge to the judge. So it is very likely the case would be continued anyways.

    I shall contact your office shortly after sending this fax to see if I have your agreement or not.

Respectfully yours,

Thomas Retzlaff, Pro se
PO Box 46424
Phoenix, AZ 85063-6424
(210) 317-9800 – Phone
(623) 547-7757 – FAX

1 | P a g e

Abdominal Surgeons Ltd.
Dr. Hilario Juarez, MD & Dr. Daniel Fang, MD
525 N. 18th Street, suite 301
Phoenix, Arizona 85006

Patient: Tom Retzlaff
DOB: ███████████
Patient Number: 97635
Date: 07/17/14

To Whom it May Concern:

Tom Retzlaff had abdominal surgery on July 14th, 2014 with Dr. Hilario Juarez. As a result of his surgery, he will not be able to travel from July 14th, 2014 until  October 14th, 2014. If there are any questions or concerns, please feel free to call the office (602) 252-1510 ext: 107.

Thank you,

Lauren Hamilton, CMA

Hilario Juarez, M.D., F.A.C.S.

Abdominal Surgeons Ltd.
Dr. Hilario Juarez, MD & Dr. Daniel Fang, MD
525 N. 18th Street, suite 301
Phoenix, Arizona 85006

July 25th, 2014

To whom it may concern,

Tom Retzlaff is cleared to travel out of state on Tuesday July 29th, 2014.

Hilario Juarez, M.D., F.A.C.S.

1  Thomas Retzlaff
   PO Box 46424
2  Phoenix, AZ 85063-6424
   (210) 317-9800 – Phone
3  (623) 547-7757 – Fax
4
   Defendant, Pro se
5

6
                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
7
                              SANTA CLARA COUNTY
8
   VIAVIEW, INC.,                          Case No.: 1-14-CH-005460
9
              Plaintiff,
10
11  vs.                                    NOTICE OF MOTION AND MOTION
                                           CONTINUANCE OF TRIAL – TELEPHONE
12  THOMAS RETZLAFF,                       APPEARANCE; MEMORANDUM OF
                                           POINTS AND AUTHORITIES
13            Defendant
                                           COMPLAINT FILED: MARCH 17, 2014
14                                         TRIAL DATE: JULY 29, 2014
15

16
17  To PLAINTIFF, VIAVIEW, INC. AND THEIR ATTORNEY OF RECORD: JAY LEIDERMAN,
18  5740 RALSTON ST., STE. 300, VENTURA, CA 93003;
19

20  NOTICE IS HEREBY GIVEN that on July 29, 2014, at 9:00 a.m., or as soon thereafter as the matter
21  may be heard, in Department 4 of the above-entitled court located at Superior Court, Civil Division,
22  191 N. First St., San Jose, CA 95113, specially appearing defendant, Thomas Retzlaff will appear
23  specially and move the Court, move for an order continuing the trial heretofore set for July 29, 2014.
24  The motion will be made on the grounds that, prior to service of process in this case, defendant had
25  major abdominal surgery on July 14, 2014, and is unable to travel over 1000 miles to San Jose to
26  litigate this case. Defendant has attached a statement from his doctor attesting to this fact that he just
27  had surgery and is unable to travel. Defendant is representing himself in this matter and does not
28  have an attorney. Prior to the filing of this motion for continuance, defendant has filed with the court

                              MOTION TO CONTINUE- 1

his Special Appearance / Motion to Quash Service Due to Lack of Jurisdiction Over the Nonresident
Defendant.

The motion will be based on this notice of motion, on the declaration(s) of Thomas Retzlaff
Defendant, the attached doctor's statement, and the supporting memorandum served and filed
herewith, on the records and file herein, and on such evidence as may be presented at the hearing of
the motion.

Defendant has requested that he be allowed to appear at this hearing via telephone appearance.

Dated: July 18, 2014          By:_____
                                   Thomas Retzlaff
                                   Defendant, In Pro Per

MOTION TO CONTINUE- 2

Memorandum of Points and Authorities in Support of Motion to Continue

## I. Background

Plaintiff ViaView, Inc. is a corporation incorporated in Delaware with its only office being in Las Vegas, NV. Despite plaintiff's contention, it has no offices within the state of California (this according to the Santa Clara County Tax Office as well as the California Secretary of State's Office and Franchise Tax Board). Thus, on this basis alone, plaintiff is not entitled to a Workplace Violence TRO or Injunction.

In any event, ViaView, Inc. is a company incorporated in Delaware that is owned by seven guys involved in the construction industry in Las Vegas, Nevada.

Cheaterville.com is a revenge porn site that is run by ViaView. On Cheaterville people can post intimate photos and personal details about their ex- or anyone else for that matter. If you find yourself posted on Cheaterville, you will be forced to pay them $199 (or more!) if you want to ransom back your photos and get the post removed.

James McGibney is the President / CEO of this revenge porn empire. At the present moment, McGibney and ViaView are both under active investigation by the e-Crimes Unit of the California Attorney General's Office for allegations involving extortion, identity theft, and for running a revenge porn website.

According to plaintiff's own pleadings, defendant Retzlaff lives in San Antonio, Texas, and plaintiff's employee McGibney lives in San Jose, CA. According to MapQuest, these two locations are nearly 1,700 miles apart.



MOTION TO CONTINUE- 3

1    Defendant, Thomas Retzlaff, is an individual who resides, and at all times herein, resided

2  in the States of Arizona and Texas. On July 14, 2014, this defendant was served with a summons

3  and complaint in the within matter by means of it being dropped onto the ground in front of the

4
   front door of defendant's son's house.

5

6    Plaintiffs are seeking a TRO / Injunction for Workplace Violence by claiming that

7  defendant made unspecified "death threats" against its employee James McGibney on Twitter or

8  the internet. Defendant denies this.

9
     Prior to "service" of this lawsuit, defendant had abdominal surgery on Monday afternoon,
10
   July 14, 2014, in Phoenix, AZ. Because of this surgery, defendant has been prohibited by his
11
   doctor, under medical advice, from traveling until October 14, 2014. See attached statement from
12
   defendant's doctor.
13

14   Defendant is representing himself in this matter and will not be able to personally appear

15 before this court for the trial, which is presently set for July 29, 2014 in San Jose, CA.

16

17   Defendant affirms that he has attempted to confer with opposing counsel and reach an

18 agreement about this matter by faxing him on July 18, 2014, at 1:30 pm PT, but counsel did not

19 respond as of the time of this filing.

20

21                         II. LEGAL ARGUMENT

22 GOOD CAUSE EXISTS FOR CONTINUANCE IN THAT:

23

24 A. Good Cause. A court may grant a continuance before or during trial on an affirmative showing of

25 good cause and each request for a continuance must be considered on its own merits (Cal. Rules of

26 Ct., Rule 3.1332(c)). Specifically, the unavailability of a party because of death, illness, or other

27 excusable circumstances, constitutes grounds for a continuance. (Cal. R. Ct. 3.1332(c)(2).) In this

28 case, the defendant has undergone abdominal surgery just a couple of days ago and is prohibited by

his doctor from traveling. Traveling would be against medical advice and the doctor's orders. Defendant lives well over 1000 miles away from San Jose, CA. As such, the trip would be extremely long and difficult. He could not even purchase an airline ticket as no airline will allow him to fly post-surgery. Defendant's presence at trial is absolutely vital has he is unrepresented by counsel and is a witness on his own behalf. Without defendant's presence, there will be no one to present his case on his behalf and defendant will not be able to testify.

**B. Significant, Unanticipated Change in Case Status Constitutes Good Cause for Continuance.**
The circumstances that may indicate good cause for a continuance include a significant, unanticipated change in the status of the case as a result of which the case is not ready for trial ( Cal. Rules of Ct., Rule 3.1332(c)(7)). Prior to "service" of the lawsuit, defendant underwent abdominal surgery on July 14, 2014, in Phoenix, AZ. Defendant, who is representing himself pro se, has been ordered by his doctor not to travel until at least October 14, 2014. Attached is a statement from defendant's doctor.

**C. Continuance Sought as Soon as Reasonably Practical.** A party seeking a continuance of the date set for trial, whether contested or uncontested or stipulated to by the parties, must make the motion or application as soon as reasonably practical once the necessity for the continuance is discovered (Cal. Rules of Ct., Rule 3.1332(b)). As stated, defendant was only just "served" with this lawsuit a couple of days ago. Prior to filing this motion, defendant has filed a Special Appearance / motion to quash service for lack of jurisdiction over the nonresident defendant. Defendant is representing himself as he has no attorney. Defendant has been diligently seeking local counsel, but it has only been a couple of days since he was served. And in any event, defendant still could not appear for the trial anyways based upon the medial advice from his doctor. Defendant would point out that the TRO in this case was granted *ex parte* and the trial date was set without any notice or input from defendant.

**D. Opportunity for Full Presentation.** A continuance should be granted if failure to allow the continuance would probably or possibly prejudice the party seeking the continuance by depriving that party of the opportunity to fully and fairly present his/her/its case (Cadle Co. v. WorldWide

MOTION TO CONTINUE- 5

Hospitality Furniture (2006) 144 Cal. App. 4th 504, 513–515, 50 Cal. Rptr. 3d 480; In re Dolly A. (1986) 177 Cal. App. 3d 195, 199, 201, 222 Cal. Rptr. 741; Cohen v. Herbert (1960) 186 Cal. App. 2d 488, 494, 8 Cal. Rptr. 922). Without a continuance, defendant will not be able to appear for the trial and will not be able to contest plaintiff's allegations. Defendant has a fundamental Constitutional right to Due Process and Access to the Courts. Through no fault of the defendant, he had abdominal surgery PRIOR to ever being served in this case.

**E. Length of Continuance Reasonable.** Defendant's request is not open-ended, but instead is "short and circumscribed." (*See Arnett v. Office of Admin. Hearings*, 49 Cal. App. 4th 332, 343 (1996) ("[A] continuance for a short and certain time is less objectionable than a continuance for a long and uncertain time.").) Defendant believes that continuing the trial to a date certain in October is reasonable because it would be against medical orders for defendant to travel earlier than this time.

**F. Continuance will best serve the interests of justice.** Neither party will be prejudiced by an order granting this continuance. (See Cal. R. Ct. 3.1332(d)(5).) If the continuance is denied, however, defendant will suffer undeniable prejudice. Defendant will not be able to attend the trial, will not be able to present his defense, will not be able to litigate his case, and will likely suffer an adverse judgment against him.

**G. First Request for Continuance.** This is defendant's first request for a continuance.

### III. Conclusion

For the foregoing reasons, defendant respectfully requests that the Court grant a continuance of the July 29, 2014, trial date to at least October 14, 2014.

MOTION TO CONTINUE- 6

Dated: July 18, 2014      By: _____

Thomas Retzlaff

Defendant, In Pro Per

## DECLARATION OF Thomas Retzlaff

I, Thomas Retzlaff, am the Defendant in this matter, and I declare the following in support of my motion for continuance:

1. On the afternoon of July 14, 2014, I had abdominal surgery in Phoenix, AZ. I was not "served" with the court papers in this case until after I had the surgery.

2. I am not represented by counsel in this case.

3. Due to the orders of my doctor, Dr. Hilario Juarez, M.D., F.A.C.S., of Abdominal Surgeons, Ltd., in Phoenix, AZ, I am specifically forbidden to travel until at least October 14, 2014. Attached to this motion is a true and correct copy of his statement confirming this.

4. During the past couple of days I have contacted numerous attorneys' offices, and have to date found no attorney that is both willing and able to handle my lawsuit.

5. I am asking this court to continue the case until I am medically able to travel after approval from the doctor.

6. I have not been able to purchase airline tickets as they won't sell me one because I have recently had surgery. I have checked with several different airlines. I have been told that there is a risk of deep vein thrombosis or DVT, which are blood clots in the veins of the legs, as well as a risk for infection. The head and the lungs are very sensitive to pressure changes while healing. Most jet flights are pressurized to about 8,000 feet (2,400 meters) and this is a significant change in atmospheric pressure that can adversely affect an abdominal surgery site.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

MOTION TO CONTINUE- 7

Dated: July 18, 2014        By: _____
                                Thomas Retzlaff
                                Defendant, In Pro Per

## CERTIFICATE OF SERVICE

I certify that I delivered a true copy of this document to plaintiff's attorney of record,

Jason Leiderman, 5740 Ralston St., Ste. 300, Ventura, CA 93003, via fax to Mr. Leiderman's fax

number of 805-654-0280, on July 18, 2014.

Thomas Retzlaff

MOTION TO CONTINUE- 8

# EXHIBIT 22

**WV-130**  **Workplace Violence Restraining Order After Hearing**

Clerk stamps date here when form is filed.

CCPOR    FILED

2014 JUL 30  P 3: 21

Superior Court of Santa Clara
County of Santa Clara

B. ADAMIAN

① **Petitioner (Employer)**

a.  Name: Via View Inc.

Lawyer for Petitioner (if any, for this case):

Name:  Jay Leiderman                    State Bar No.:

Firm Name:  Law Offices of Jay Leiderman

b.  Your Address (If you have a lawyer, give your lawyer's information.):

Address:  5740 Ralston St., 300

City: Ventura                    State:  CA    Zip: 93003

Telephone:  (805) 654-0200        Fax:  (805) 654-0280

E-Mail Address:  jay@crininal-lawyer.me

Fill in court name and street address:

Superior Court of California, County of Santa Clara

191 N. First Street
San Jose, CA 95113
CIVIL DIVISION

② **Employee (Protected Person)**

Full Name:  James McGibney

Court fills in case number when form is filed.

Case Number:
114CH005460

③ **Respondent (Restrained Person)**

Full Name:  Thomas Christopher Retzlaff

Description:

| | |
|---|---|
| Sex: ☒ M   ☐ F  Height: **unkn**  Weight: **unkn**  Date of Birth: | |
| Hair Color: brown          Eye Color: brown        Age: 48    Race: White | |
| Home Address (if known): 8312 W. Elm Street | |
| City: Phoenix                          State: AZ      Zip: 85037 | |
| Relationship to Employee: | |

④ ☒ **Additional Protected Persons**

In addition to the employee, the following family or household members or other students are protected by the temporary orders indicated below:

| Full Name | Sex | Age | Household Member? | Relation to Employee |
|---|---|---|---|---|
| Brittany Retzlaff | F | 28 | ☐ Yes ☒ No | employee |
| Jason S. Leiderman | M | 43 | ☐ Yes ☒ No | employee |
| | | | ☐ Yes ☐ No | |

☐ Additional protected persons are listed at the end of this Order on Attachment 4.

⑤ **Expiration Date**

This Order, except for any award of lawyer's fees, expires at:

| | |
|---|---|
| Date: 28 July, 2017        Time: 11:59:00 AM        ☐ a.m. ☒ p.m. | |

If no expiration date is written here, this Order expires three years from the date of issuance.

**This is a Court Order**

Judicial Council of California, www.courts.ca.gov
Revised July 1, 2014, Mandatory Form
Code of Civil Procedure, §§ 527.8 and 527.9
Approved by DOJ

**Workplace Violence Restraining Order
After Hearing (CLETS-WHO)**
(Workplace Violence Prevention)

WV-130, Page 1 of 6 →

| Case Number: |
| 114CH005460 |

## (6) Hearing

a. There was a hearing on *(date):* 7-29-14 _____ at *(time):* 9:00am _____ in Dept.: 19 _____ Room: _____
*(Name of judicial officer):* Socrates P. Manoukian _____ made the orders at the hearing.

b. These people were at the hearing:

(1) ☐ The petitioner/employer representative *(name):* _____

(2) ☒ The lawyer for the petitioner/employer *(name):* Jason S. Leiderman _____

(3) ☒ The employee      (4) ☐ The lawyer for the employee *(name):* _____

(5) ☒ The respondent ✱      (6) ☒ The lawyer for the respondent *(name):* Katrina Saleen (Specially Appearing)

☐ Additional persons present are listed at the end of this Order on Attachment 5.

c. ☐ The hearing is continued. The parties must return to court on *(date):* _____ at *(time):* _____.

*[handwritten:]* ✱ via skype SPM
SPM (partial)

### To the Respondent:

The court has granted the orders checked below. If you do not obey these orders, you can be arrested and charged with a crime. You may be sent to jail for up to one year, pay a fine of up to $1,000, or both.

## (7) Personal Conduct Orders

a. You are ordered **not** do the following things to the employee

☒ and to the other protected persons listed in (4):

(1) ☒ Harass, molest, strike, assault (sexually or otherwise), batter, abuse, destroy personal property of, or disturb the peace of the person.

(2) ☒ Commit acts of violence or make threats of violence against the person.

(3) ☒ Follow or stalk the person during work hours or while going to or from the place of work.

(4) ☒ Contact the person, either directly or indirectly, in any way, including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means.

(5) ☒ Enter the person's workplace.

(6) ☒ Take any action to obtain the person's address or locations. If this item is not checked, the court has found good cause not to make this order.

(7) ☐ Other *(specify):*

☐ Other personal conduct orders are attached at the end of this Order on Attachment 7a(7).

_____
_____
_____
_____
_____
_____

b. Peaceful written contact through a lawyer or a process server or other person for service of legal papers related to a court case is allowed and does not violate this order.

### This is a Court Order.

**Workplace Violence Restraining Order
After Hearing (CLETS-WHO)**
(Workplace Violence Prevention)

Case Number:
114CH005460

### (8) Stay-Away Order

a.  You must stay at least ·1,000 yards away from *(check all that apply)*:

   (1) ☒ The employee
   (7) ☒ The employee's children's place of child care

   (2) ☒ Each other protected person listed in ④
   (8) ☒ The employee's vehicle

   (3) ☒ The employee's workplace
   (9) ☐ Other *(specify)*:

   (4) ☒ The employee's home

   (5) ☒ The employee's school

   (6) ☒ The employee's children's school

b.  This stay-away order does not prevent you from going to or from your home or place of employment.

### (9) ☒ No Guns or Other Firearms and Ammunition

a.  You cannot own, possess, have, buy or try to buy, receive or try to receive, or in any other way get guns, other firearms, or ammunition.

b.  If you have not already done so, you must:

   (1) Sell to or store with a licensed gun dealer or turn in to a law enforcement agency any guns or other firearms in your immediate possession or control. This must be done within 24 hours of being served with this Order.

   (2) File a receipt with the court within 48 hours of receiving this Order that proves that your guns have been turned in, sold, or stored. *(You may use Form WV-800,* Proof of Firearms Turned In, Sold, or Stored *for the receipt.)*

c.  ☐ The court has received information that you own or possess a firearm.

### (10) ☒ Costs

You must pay the following amounts for costs to the petitioner

| Item | Amount | Item | Amount |
|------|--------|------|--------|
| 3 TRO Hearings | $ 7,500.00 | | $ |
| 1 TRO Hearing · | $ 2,500.00 | | $ |
| | $ | | $ |

☐ Additional amounts are attached at the end of this Order on Attachment 10.

### (11) ☒ Other Orders *(specify)*:

Counsel to submit invoice for attorney fees.

☐ Additional orders are attached at the end of this Order on Attachment 11.

**This is a Court Order**

**Workplace Violence Restraining Order
After Hearing (CLETS-WHO)**
(Workplace Violence Prevention)

Case Number:
114CH005460

## To the Person in ①

⑫ **Mandatory Entry of Order Into CARPOS Through CLETS**

This Order must be entered into the California Restraining and Protective Order System (CARPOS) through the California Law Enforcement Telecommunications System (CLETS). *(Check one)*:

a. ☐ The clerk will enter this Order and its proof-o f-service form into CARPOS.

b. ☒ The clerk will transmit this Order and its proof-of-service form to a law enforcement agency to be entered into CARPOS.

c. ☐ By the close of business on the date that this Order is made, the petitioner or the petitioner's lawyer should deliver a copy of the Order and its proof-of-service form to the law enforcement agency listed below to enter into CARPOS.

Name of Law Enforcement Agency            Address  *(City, State, Zip)*

☐ Additional law enforcement agencies are listed at the end of this Order on Attachment 12.

⑬ **Service of Order on Respondent**                *via Skype (partial). Order served*

a. ☒ The ~~Respondent~~ *personally attended the hearing. No other proof of service is needed.* *on Respondent's counsel.* SPM

b. ☒ The respondent did not attend the hearing.

(1) ☐ Proof of service of Form WV-110, *Temporary Restraining Order,* was presented to the court. The judge's orders in this form are the same as in Form WV-110 except for the expiration date. The respondent must be served with this Order. Service may be by mail.

(2) ☐ The judge's orders in this form are different from the temporary restraining orders in Form WV-110. Someone—but not the petitioner or anyone protected by this order—must personally serve a copy of this Order on the respondent.

⑭ **No Fee to Serve (Notify) Restrained Person**

The sheriff or marshal will serve this Order without charge because the Order is based on unlawful violence, a credible threat of violence, or stalking.

⑮ Number of pages attached to this Order, if any: _1_

Date: **30 July 2014**
**nunc pro tunc**
**to 29 July 2014**

Judicial Officer        SOCRATES P. MANOUKIAN

**This is a Court Order.**

| Case Number: |
| --- |
| 114CH005460 |

## Warning and Notice to the Respondent

### You Cannot Have Guns or Firearms

You cannot own, have, possess, buy or try to buy, receive or try to receive, or otherwise get guns, other firearms, or ammunition while this Order is in effect. If you do, you can go to jail and pay a $1,000 fine. You must sell to or store with a licensed gun dealer or turn in to a law enforcement agency any guns or other firearms that you have or control as stated in item ⑨. The court will require you to prove that you did so.

## Instructions for Law Enforcement

### Enforcing the Restraining Order

This Order is enforceable by any law enforcement agency that has received the Order, is shown a copy of the Order, or has verified its existence on the California Restraining and Protective Order System (CARPOS). If the law enforcement agency has not received proof of service on the restrained person, and the restrained person was not present at the court hearing, the agency must advise the restrained person of the terms of the Order and then must enforce it. Violations of this Order are subject to criminal penalties.

### Start Date and End Date of Orders

This Order *starts* on the date next to the judge's signature on page 4 and *ends* on the expiration date in item ⑤ on page 1.

### Arrest Required If Order Is Violated

If an officer has probable cause to believe that the restrained person had notice of this order and has disobeyed it, the officer must arrest the restrained person. (Pen. Code, §§ 836(c)(1), 13701(b).) A violation of the order may be a violation of Penal Code section 166 or 273.6. Agencies are encouraged to enter violation messages into CARPOS.

### Notice/Proof of Service

The law enforcement agency must first determine if the restrained person had notice of the orders. Consider the restrained person served (given notice) if (Pen. Code, § 836(c)(2)):

• The officer sees a copy of the *Proof of Service* or confirms that the *Proof of Service* is on file; *or*
• The restrained person was at the restraining order hearing or was informed of the order by an officer.

An officer can obtain information about the contents of the order and proof of service in CARPOS. If proof of service on the restrained person cannot be verified and the restrained person was not present at the court hearing, the agency must advise the restrained person of the terms of the order and then enforce it.

### If the Protected Person Contacts the Restrained Person

Even if the protected person invites or consents to contact with the restrained person, this Order remains in effect and must be enforced. The protected person cannot be arrested for inviting or consenting to contact with the restrained person. The orders can be changed only by another court order. (Pen. Code, § 13710(b).)

## This Is a Court Order



**Workplace Violence Restraining Order**
**After Hearing (CLETS-WHO)**
(Workplace Violence Prevention)

Case Number:
114CH005460

## Conflicting Orders—Priorities for Enforcement

**If more than one restraining order has been issued, the orders must be enforced according to the following priorities:** (See Pen. Code, § 136.2, Fam. Code, §§ 6383(h)(2), 6405(b).)

1. *EPO:* If one of the orders is an *Emergency Protective Order* (form EPO-001) and is more restrictive than other restraining or protective orders, it has precedence in enforcement over all other orders.

2. *No Contact Order:* If there is no EPO, a no-contact order that is included in a restraining or protective order has precedence over any other restraining or protective order.

3. *Criminal Order:* If none of the orders includes a no contact order, a domestic violence protective order issued in a criminal case takes precedence in enforcement over any conflicting civil court order. Any nonconflicting terms of the civil restraining order remain in effect and enforceable.

4. *Family, Juvenile, or Civil Order:* If more than one family, juvenile, or other civil restraining or protective order has been issued, the one that was issued last must be enforced.

*Clerk's Certificate*
*[seal]*

*(Clerk will fill out this part.)*
**—Clerk's Certificate—**

I certify that this *Workplace Violence Restraining Order After Hearing* is a true and correct copy of the original on file in the court.

Date: _____     Clerk, by _____ JUL 3 0 2014 _____, Deputy

**This is a Court Order**

**Workplace Violence Restraining Order
After Hearing (CLETS-WHO)
(Workplace Violence Prevention)**

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Via View Inc. vs. Retzlaff | 114CH005460 |

ATTACHMENT (Number): 1

*(This Attachment may be used with any Judicial Council form.)*

Additional protected persons

| Full Name | SEX | AGE | Lives with you | How are they related to you |
|---|---|---|---|---|
| Christina McGibney | F | 32 | Yes | wife |
| | M | 4 | Yes | son |
| ███████████ | M | 2 | Yes | son |
| ███████████ | M | 17 weeks | Yes | son |

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page 1 of 1

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
to Judicial Council Form

www.courtinfo.ca.gov

# EXHIBIT 23

# 15

**Tuesday**
Jul 2014

# Lawsuit Filed Against Jay Leiderman!

POSTED BY BY FILES IN UNCATEGORIZED

≈ 307 COMMENTS

*Tags*

defamation, Jason Scott
Leiderman, Jay
Leiderman, Vsview



## Maricopa County JUSTICE COURTS

Home · Find a Case ▾ · Case Types ▾ · Case Tools ▾ · Forms · Find a Judge · Locations

**Related Links** ▾ Select Link ▾

### JUSTICE COURTS CASE INFORMATION - CASE HISTORY

**CASE TOOLS**

← return to previous page

**Case Information**

| Case Number | CC2014-122228 | Judge: | Wismer, Craig |
| File Date | 7/15/2014 | Location: | Arrowhead Justice Court |
| Case Type: | Justice Civil | Case Status: | 01 - New Case |

**Party Information**

| Party Name | Relationship | | |
| Toni Reszlaff | Plaintiff | N/A | Attorney |
| Jason Scott Leiderman | Defendant | N/A | Pro Per |
| | | N/A | Pro Per |

**Case Calendar**
There are no calendar events on file

**Judgments**
There are no judgments on file

REPLY

Not to put too fine a point on it, but so what?

BV Files said:

# 26

Saturday
JUL 2014

## 3rd New Judge – Assigned to Case

POSTED BY BV FILES IN UNCATEGORIZED

247 COMMENTS



## BV Files *said:*

July 25, 2014 at 12:31 am

Not to put too fine a point on it, but so what? It seems to me that the very last person you would want to get involved with in a lawsuit is a vexatious litigant! Remember the Tar Baby from *Uncle Remus' Stories?*

Like I said before: a fool and his money are soon parted. How else do you think Leiderman afforded his month long European Vacation?

**REPLY**

# *Nickolas Gene (Nick) Mamula, Jr. Owns a Revenge Porn Website*

POSTED BY BY FLEEK IN UNCATEGORIZED

🔒 217 COMMENTS

*10*
*Thursday*
*Jan 2014*

**Tags**

Bullyville.com, Leigha Mamula, Nick Mamula, Revenge Porn, T. Nicholas Co., VIaVIew



— Nickolas Gene (Nick) Mamula, Jr.

As previously mentioned, as a part of our nationwide Public Service Campaign, in which we are copying this article to all major media outlets

 **BV Files** *said:*  July 11, 2014 at 9:44 pm

Normally I don't comment on what some retards on twitter are saying. But (and that's always a "but" isn't there), but this level of idiocy is comment worthy.

[**Admin Note:** I removed a link to twitter that I had posted after thinking about it a bit. Why give Cpt O the publicity? Only about 5 people read this twitter posts. But if I put them here, 7,000 or more will see it, and there is no point in my giving him some free PR. So I removed the link to his twitter post.]

Do you idiots honestly believe that only ONE person in the entire world uses the alias "klansman" on twitter, Disqus, or X-fire, or Facebook or anywhere else? You e-Detectives are obviously high on heroin once again! A quick Google search turns up 1000s of people who use that name "klansman" as an alias.

Multiple people go by the name "Klansman" on online forums all over the world – not just this one guy!

And not to put too fine a point on it, but who cares? Thomas could be the worst guy in the entire world. So what? How does that help McGibney out?

Does Thomas being a "bad guy" make McGibney's Stolen valor FRAUD any less fraudulent?

Does Thomas being a "bad guy" make it okay for McGibney to have committed FELONY PERJURY in front of the judge in San Jose by lying about his computer expertise and FAKE military credentials?

Does Thomas being a "bad guy" help McGibney restore his ViaView advertisers? Or does it just make him look stupid and weak for getting beat so badly by this "bad guy" (assuming TR is even behind what happened to McGibney).

Lastly, does Thomas being a "bad guy" some how make the accusations that McGibney used to beat and rape his ex-wife Farah seem any less heinous (if true)?

p.s.
Oh, and McGibney, er, I mean, Cpt Obvious: The IP for that Cheaterville post was NOT confirmed to where Tom lives, you lying sack of shit. It was "confirmed" to belong to a fire station belonging to the Dallas Fire Dept. according to your / McGibney"s own post on Bullyville.

# 01

Tuesday
Jul 2014

## Is James McGibney a Pedophile?

POSTED BY BV FILES IN UNCATEGORIZED

💬 133 COMMENTS

 **!oxomoxo! *said:*** July 2, 2014 at 4:51 pm

Not to put too fine a point on it; a very minor detail in the grand scheme of things to be sure, but to chacterize Ms. Lipton as "an old lady from Long Island" might be overstating the case just a tad.

According to *our* files, Lipton would be in her early to mid fifties by now, and while to a fourteen yr old 4-chan Dark Lord wannabe, 50-something probably *does* seem like the pinnacle of incipient decrepitude, general consensus would probably chart that as "advanced middle-age", not-quite-yet-a-crone-ready-for-senior-citizen-discount.

But even as that may be, the idea that a stridently pro-Israel feminist residing in New York would be collaborating with an allegedly violent KKK/Aryan Brotherhood ex-con living in Texas or Arizona or Nevada, or California or Alaska or Tierra del Fuego or Dar es Salaam or *wherever* the hell Retzlaff lives, is a fantasy to be found exclusively in the fevered mind of McGibney and his butthurt minions, or on *very* bad "reality" TV, assuming that there is a valid distinction to be made there. *Hullarious.*

**REPLY**

 **BV Files *said:*** July 2, 2014 at 7:02 pm

Except that pretty much sums all of us Admins here up. We play Call of Duty during our free time when we're not talking shit about Mc-Stupid & Company. We neglect our children (those that have them) in favor COD or BF4.

# EXHIBIT 24

Help  Sign in

Today's Deals     Gift Cards     Sell     Help          Your Account          Wish List

Departments          Fire & Kindle          Prime          All Departments

Your Amazon.com     Your Browsing History     Recommended For You     Improve Your Recommendations     Your Profile     Learn More

This page may not work in your current browser.
We're sorry. Functionality for this page is not supported in Internet Explorer 8 or older. Please upgrade the latest version of Internet Explorer, Chrome, or FireFox.

Recent Activity:  All

No other items. Back to top
Loading...



Thomas Retzlaff
Texas

activities
Public Wish List (1)

other
View the old profile
Give Feedback to Amazon

| Get to Know Us | Make Money with Us | Amazon Payment Products | Let Us Help You |
|---|---|---|---|
| Careers | Sell on Amazon | Amazon.com Rewards Visa Card | Your Account |
| Investor Relations | Sell Your Apps on Amazon | Amazon.com Store Card | Shipping Rates & Policies |
| Press Releases | Become an Affiliate | Shop with Points | Amazon Prime |
| Amazon and Our Planet | Advertise Your Products | Credit Card Marketplace | Returns & Replacements |
| Amazon in the Community | Independently Publish with Us | Amazon Currency Converter | Manage Your Content and Devices |
| Fire TV – Amazon's Media Player | › See all | | Help |

## amazon.com

Australia   Brazil   Canada   China   France   Germany   India   Italy   Japan   Mexico   Spain   United Kingdom

| | | | | | | |
|---|---|---|---|---|---|---|
| 6pm<br>Score deals<br>on fashion brands | AbeBooks<br>Rare Books<br>& Textbooks | ACX<br>Audiobook Publishing<br>Made Easy | AfterSchool.com<br>Kids' Sports, Outdoor<br>& Dance Gear | Alexa<br>Actionable Analytics<br>for the Web | AmazonFresh<br>Groceries & More<br>Right To Your Door | Amazon Local<br>Great Local Deals<br>In Your City |
| AmazonSupply<br>Business, Industrial<br>& Scientific Supplies | Amazon Web Services<br>Scalable Cloud<br>Computing Services | Audible<br>Download<br>Audio Books | BeautyBar.com<br>Prestige Beauty<br>Delivered | Book Depository<br>Books With Free<br>Delivery Worldwide | Bookworm.com<br>Books For Children<br>Of All Ages | Casa.com<br>Kitchen, Storage<br>& Everything Home |
| ComiXology<br>Thousands of<br>Digital Comics | CreateSpace<br>Indie Print Publishing<br>Made Easy | Diapers.com<br>Everything<br>But The Baby | DPReview<br>Digital<br>Photography | East Dane<br>Designer Men's<br>Fashion | Fabric<br>Sewing, Quilting<br>& Knitting | Goodreads<br>Book reviews<br>& recommendations |
| IMDb<br>Movies, TV<br>& Celebrities | Junglee.com<br>Shop Online<br>in India | Kindle Direct Publishing<br>Indie Digital Publishing<br>Made Easy | Look.com<br>Kids' Clothing<br>& Shoes | MYHABIT<br>Private Fashion<br>Designer Sales | Shopbop<br>Designer<br>Fashion Brands | Soap.com<br>Health, Beauty &<br>Home Essentials |
| TenMarks.com<br>Math Activities<br>for Kids & Schools | Vine.com<br>Everything<br>to Live Life Green | Wag.com<br>Everything<br>For Your Pet | Warehouse Deals<br>Open-Box<br>Discounts | Woot!<br>Discounts and<br>Shenanigans | Yoyo.com<br>A Happy Place<br>To Shop For Toys | Zappos<br>Shoes &<br>Clothing |

Conditions of Use    Privacy Notice    Interest-Based Ads    © 1996-2014. Amazon.com, Inc. or its affiliates

* **Klansman**

  o Posted comments to the following blog: http://adamsteinbaugh.com/2013/02/11/meet-hunter-taylor-reportedly-behind-revenge-porn-site-texxxa/#comment-504

    * Email address: the.klansman@hotmail.com

  * IP address: 72.201.185.236 [Cox Communications, Phoenix]

    * A post on Adam's blog using the same IP address was made by "todd", (http://adamsteinbaugh.com/2013/02/15/isanybodydown-fake-identities-of-craig-catfish-brittain/#comment-572).

    o Email address: **t_retz@hotmail.com.**

      * This email address is linked to "**Klansman**" here: http://es.xfire.com/blog/retz3076/895220/

        * This account uses the name "Tom" and says he's 47 years old (the same age as Retzlaff).

      * The email address was used by "**Thomas C. Retzlaff, Esq.**" in a post here, which accurately documented Retzlaff's family history: "http://paulbuddehistory.com/family/usa/" in the archive

      * Retzlaff used this email address in his application to the University of Texas.

□ Racist:

- Posted "She was race mixing with a black guy. She deserved to die. The Klan shall rise!" http://www.wfaa.com/news/crime/Mother-daughter-are-victims-of-Grand-Prairie-double-homicide-208074571.html

□

Federico's Mexican Food: connects Santucci and Klansman

- Santucci claimed to be present at a Phoenix, AZ interview about Federico's. https://www.facebook.com/permalink.php?id=412666695292&story_fbid=10153227600900293 This helped us corroborate the Phoenix area IPs tied into Thomas Retzlaff.

# Fake Facebook Profile

This is purportedly Brittany's Facebook page:
https://www.facebook.com/brittany.cintron.986

Wonder who created that page Thomas? The page and all of its content was created on May 8, 2013, and made to look like it's a legit profile (e.g., it has multiple profile pictures, but they're all posted on the same day). The /content /of the page is sickening, though.

https://www.facebook.com/brittany.cintron.986/likes
Look at the 'likes' to see the 'inspirational people': "my daddy"; "Father-Daughter incest";
"Chilling with the Ku Klux 🔲🔲🔲."